STATE of Minnesota, Respondent,

v.

Brad Alan VOORHEES, Appellant.

No. C6–98–23.

Supreme Court of Minnesota.

May 13, 1999.

Amended on Denial of Rehearing
July 23, 1999.

John M. Stuart, State Public Defender, Cathryn Middlebrook, Assistant State Public Defender, Minneapolis, for appellant.

Brad Alan Voorhees, Bayport, pro se.

Michael A. Hatch, Attorney General, State of Minnesota, Heidi Neff Christianson, Assistant Attorney General, St. Paul, Alan Mitchell, St. Louis County Attorney, Duluth, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Appellant Brad Alan Voorhees appeals from a jury verdict finding him guilty of the premeditated first-degree murder of his wife, Carolyn. Voorhees asserts several points of error by the district court. Voorhees first argues that he was denied his constitutional right to present a defense because the court: (a) precluded his expert witness from offering opinion testimony concerning the effects of a combination of Prozac, alcohol, and methamphetamine on his ability to premeditate the killing; (b) precluded him from testifying whether Prozac caused him to kill his wife; and (c) precluded a cellmate from testifying about the cellmate's observations of Voorhees' demeanor and physical characteristics while in prison. Second, Voorhees argues that the district court erred in instructing the jury on the applicable law of involuntary intoxication. Third, Voorhees argues that the state presented insufficient evidence of premeditation and insufficient evidence that Voorhees did not act in the heat of passion. In a supplemental pro se brief, Voorhees also argues: (1) that the state committed reversible misconduct on five occasions during the grand jury proceedings and trial; (2) that the district court should have granted his request to substitute his counsel; and (3) that his trial counsel acted ineffectively

and to Voorhees' prejudice on three occasions. We affirm.

Brad Alan Voorhees met Carolyn Seitz in 1992 at a bible study class and the two were married the next year. During the three years of their marriage, several relatives with whom Voorhees and Carolyn were close died, including Voorhees' elderly uncle, Carolyn's grandmother, and Voorhees' brother. Especially troubling to Voorhees was the death of his brother, an alcoholic who died in May 1996 while awaiting a liver transplant. Voorhees' father also had died at a young age due to alcoholism. During this traumatic time, the couple's marriage relationship began to deteriorate. Both Voorhees and Carolyn stopped attending church regularly and, apparently after a long period of sobriety, Voorhees began to drink and stay out all night.

In May 1996, a doctor gave Voorhees a one-month supply of the antidepressant drug Prozac and also a four-month prescription, refillable monthly. Voorhees began to take Prozac daily, as prescribed by the doctor. While Voorhees reported that Prozac initially had a positive effect on him, he testified that he soon began to feel "numb" and suicidal; at one point waking up feeling like he "wanted to strangle [him]self." In June, Carolyn reported to her sister-in-law that her relationship with Voorhees had been improving since he started taking Prozac. But shortly thereafter, Voorhees resumed drinking and staying out all night and the marriage relationship again deteriorated. Eventually, Carolyn decided that the marriage was over and, on July 5, 1996, she told Voorhees she was moving out of their apartment. Carolyn moved out of the apartment and into her parents' home on July 12, 1996. A male friend of Carolyn assisted her in the move.

Much of the information we have concerning the time after Carolyn moved out of the apartment until she was killed comes from Voorhees' statements to police and his trial testimony. After Carolyn

moved out of the apartment, Voorhees called her at her parents' home numerous times in attempts to talk with her about working things out and saving their marriage. Carolyn, however, was firm in her decision that she would not go back to her troubled marriage with Voorhees. Upset by his wife's decision to leave him, Voorhees' performance at work began to decline. On two occasions, he failed to show up at his place of employment, where he worked as a delivery route driver. While driving his route, he received two traffic-related warnings and on another occasion he left a box containing live tropical fish in a warehouse over a weekend and all the fish died. Following this last incident, Voorhees' employer terminated his employment.

Voorhees continued to be upset with Carolyn. Toward the end of July, Carolyn had marriage dissolution papers served on Voorhees. On Sunday, July 28, after he had received the dissolution papers and approximately a week before the killing, Voorhees called Carolyn at her parents' home and told her that he was going to commit suicide by taking pills. He testified at trial that Carolyn responded by saying if he tried to kill himself that way, he would "just end up brain dead," with someone "feed[ing him] through a straw" for the rest of his life. Immediately after this conversation with Carolyn, Voorhees called his mother, who spoke with him for two hours, calming him down and promising to send him some money to help out with his bills.

In the week before Carolyn was killed, Voorhees continued to go to bars and drink. He did, however, contact a treatment program, but testified that the representative with whom he spoke advised him that he could not be admitted to an inpatient program. On Friday, August 2, Voorhees purchased an "eight-ball" of crank, a form of methamphetamine. His monthly supply of Prozac ran out that same day and, although he had been taking the prescribed amount of Prozac up to that time,

he did not refill the prescription because he did not believe he should take the Prozac and the methamphetamine at the same time. Throughout the weekend, Voorhees continued to take methamphetamine and drink alcohol. He testified that he was unable to sleep that entire weekend as a result of ingesting the methamphetamine.

Voorhees testified that on Monday, August 5, 1996, he stayed in bed all day, depressed but unable to sleep. His sister-in-law called him on the telephone and encouraged him to get his Prozac prescription refilled. At approximately 6:00 p.m., he left his apartment, finished the last of the methamphetamine he had purchased, and then decided to "snap out of this and * * * get straight." He drove to his former place of employment and spoke with his manager, who told him that she would hire him back as soon as a job opened up. He next proceeded to Wal–Mart to get his Prozac prescription refilled. When Voorhees arrived at Wal–Mart sometime between 8:00 and 8:30 p.m., he saw Carolyn's car in the parking lot. He parked his car behind hers and walked to the store.

When Voorhees entered the store, he saw Carolyn and her friend, Kandice Linskie, at the front of the checkout line. He noticed that one of the items Carolyn was purchasing was a douche. After waiting for Carolyn and Linskie to finish checking out, he asked to talk to Carolyn. Linskie testified that Carolyn told Voorhees to sign the divorce papers and leave her alone. Carolyn and Linskie then left the store and Voorhees accompanied them to the parking lot, where he continued to speak with Carolyn for approximately 20 minutes longer about finances and their impending marriage dissolution. At Carolyn's request, Linskie stayed with Carolyn while she and Voorhees spoke. Because Voorhees had noticed that one of the items Carolyn purchased in Wal–Mart was a douche, he asked her if she was seeing someone else. Carolyn did not respond to this question.

When Carolyn drove away, Voorhees got into his car and followed her out of the parking lot. He then decided to have a drink and drove to the Chalet Bar where he had a mixed drink. Voorhees testified that, while at the bar, he felt he had nothing to live for, thought about the douche he had seen Carolyn purchase, and thought about what Carolyn said would happen to him if he tried to commit suicide. He testified that it was at that point that "a gun popped into my mind, that I couldn't fail with a gun." At approximately 9:05 p.m., he drove back to Wal–Mart, walked into the store, and went to the gun department with the purpose of purchasing a gun. He asked the clerk to show him a .22 caliber semi-automatic Marlin rifle that was in a display case and was the least expensive gun in the store. After indicating to the clerk that he wanted to purchase the rifle, Voorhees filled out the required federal firearms purchase paperwork and bought both the rifle and a 50–round box of .22 caliber ammunition, the least amount of ammunition Wal–Mart sold. The transaction was completed at 9:26 p.m.

The clerk who sold Voorhees the rifle testified that Voorhees was coherent and in a good mood, and that Voorhees did not appear to be under the influence of alcohol or drugs. The clerk told Voorhees how to load the rifle, which was a semi-automatic weapon. The clerk testified that the trigger on the semi-automatic rifle has to be squeezed each time the shooter wants to fire a bullet.

From Wal–Mart, Voorhees proceeded to Charlie's Bar, where he resumed his drinking. Voorhees recalls drinking two or three mixed drinks and five to six beers. The bartender who served Voorhees, however, remembers serving him one mixed drink and three or four beers between the hours of 9:00 p.m. and midnight. The bartender testified that Voorhees did not appear to be drunk or on methamphetamine when he left. Voorhees did not speak with anyone other than the bartender while he was at the bar.

Voorhees returned to his apartment, walked his dog, brought the rifle inside, and changed into dark clothing. He left a message on his telephone answering machine stating that this was the last message he would ever leave and that he was sorry. He read the owner's manual for the rifle he had just purchased and walked around his apartment, looking at pictures and at the rings Carolyn had left behind when she moved out. He wrote a note to his mother on the card she had sent to him with the money he had received on Friday. The note read: "Mom I love you – Sorry!! Love Brad Always – 8–6–96 2 a.m." On the back of a church worship service bulletin, he wrote: "To who ever realy [sic] cares – I hope you have a good life! Let this be a lesson to everybody about marriage." At trial, Voorhees testified that it was at that point that he decided to shoot himself in front of Carolyn.

At approximately 2:00 a.m., Voorhees put the rifle into the trunk of his car and drove to Residential Services, Inc. (RSI), where Carolyn was at work. RSI was located in a house on Wicklow Street, a dead-end street. As an employee of RSI, Carolyn took care of patients who had suffered traumatic brain injuries. She often worked at night and alone. According to another RSI employee who sometimes worked with Carolyn, Voorhees had at times parked on Wicklow when Carolyn was working and just sat in his car. This same employee also testified that Carolyn had told her that Voorhees had come to the house within a month or so before the killing and had tried to speak with her, but that she had refused to let him into the house. Voorhees testified that, on the night of the killing, he parked one street up from Wicklow. He did this because he did not want Carolyn to see him and call the police before he could kill himself in front of her.

After parking his car, Voorhees took the rifle out of the trunk and, while in the

dark, loaded 11 bullets into the chamber. He picked up a sealable plastic bag, in which he had placed the remaining bullets, and negotiated his way down a dark path that led to Wicklow Street. He then saw Carolyn come out of the house, light a cigarette, and walk down the stairs to the corner of the house. She apparently did not know he was there. Carolyn turned around and saw Voorhees, startling both of them, at which point Carolyn began to yell at Voorhees, telling him to "just sign the [ ] divorce papers; let [her] get on with [her] life," that she did not love him, and that there was someone else. According to his testimony, Voorhees "reacted" by pulling the trigger until the rifle "quit going off." He saw Carolyn fall and then ran back up the path, dropping the rifle on the way, and got into his car. Neighbors subsequently reported hearing a "blood-curdling scream" and shooting at around 2:30 a.m., the approximate time when Carolyn was killed.

After the shooting, Voorhees drove to a store and called his sister-in-law and told her that he had shot Carolyn.[1] When his sister-in-law told Voorhees he should come to her house, then turn himself in, he decided not to go to her house because he did not want her and her neighbors to be upset when the police cars arrived to arrest him. Voorhees then proceeded to the Spirit Mountain Motel, where he threw away the empty rifle box with the receipt of purchase inside. At 4:13 a.m., he called 911 from a rest area at Thompson Hill. The call Voorhees placed to 911 was tape-recorded. On that tape, Voorhees told the 911 operator in a calm voice where Carolyn's body could be found and that he had shot her 11 times. He also described the location from where he was calling. When the 911 operator told him that the shooting had not yet been reported, he replied matter-of-factly, "Shoot, she's probably dead." The 911 operator then told Voorhees to stay on the telephone and that the police

were on their way. Voorhees continued to speak with the 911 operator until police officers came to arrest him.

The arresting officers reported that Voorhees appeared calm and sober when they arrived. After they handcuffed him and put him in the squad car, however, Voorhees broke down and began to cry. From that point on, and in several different interviews, Voorhees repeatedly admitted killing Carolyn. In one of these interviews, he stated that he was jealous and hurt when he saw Carolyn purchasing a douche at Wal–Mart and that the fact that she was purchasing this item had made him think she was sleeping with someone else. During one of the interviews conducted in the hours after his arrest, officers asked Voorhees if he was thinking about killing Carolyn when he purchased the rifle. He replied that he did not know, but that he "was in like a state of jealousy."

For approximately five hours after his arrest, Voorhees did not tell police that he had planned to kill himself when he went to RSI. He did not mention this plan when he called 911, when he was arrested, when he was first formally questioned, or when he was being transported to the hospital. During the first formal questioning, which took place from 5:36 to 6:25 a.m., Voorhees was asked what he planned to do when he went to RSI. He said nothing about wanting to commit suicide, but said instead that he had planned to "sit there for a while and then leave." It was not until an interview that began at 9:27 a.m. that Voorhees stated he planned to kill himself, not Carolyn, when he went to RSI. Even then, he did not tell the police that Carolyn had told him she was seeing someone else. Not until his trial did Voorhees state that his impetus for shooting Carolyn was that she had told him there was someone else.

1. The sister-in-law first reported to the police that Voorhees told her, "I just shot Carolyn," but then testified at trial that he said, "I think

I just shot Carolyn." Voorhees contends that he told his sister-in-law that he thought he just shot Carolyn.

When the police responded to the scene of Carolyn's shooting, she was dead. Just as Voorhees had told the 911 operator, she had been shot 11 times. The medical examiner who performed the autopsy concluded that she had been shot from many different angles, some of the bullet wounds suggesting that she had been shot while she lay on the ground. Police located the rifle Voorhees had used to shoot Carolyn along the path leading to Wicklow Street, just as Voorhees had told them. The empty rifle box and purchase receipt were found at the Spirit Mountain Motel, consistent with Voorhees' statements after he was arrested.

Voorhees' blood alcohol level at 4:53 a.m. on August 6, 1996 was .03. Blood and urine tests taken from Voorhees at approximately 6:00 a.m. on August 6 revealed 154 nanograms/milliliter of Prozac in his blood (the therapeutic range for Prozac is 300–1150 nanograms/milliliter), no methamphetamine in his blood, negligible amounts of methamphetamine in his urine, and no alcohol in his blood. The medical examiner who performed the autopsy of Carolyn and who is also an expert in blood alcohol level interpretation and extrapolation testified that, assuming Voorhees had stopped drinking by 1:30 a.m. on August 6, his blood alcohol level at the time of the killing would have been between .065 and .07.

At trial, Voorhees relied on the defense of involuntary intoxication. Specifically, Voorhees' theory of the case was that he became involuntarily intoxicated through his ingestion of a combination of Prozac, methamphetamine, and alcohol. He produced an expert witness to testify that this combination may cause a person to become involuntarily intoxicated and that the combination did, in fact, cause Voorhees to become involuntarily intoxicated on the night he killed Carolyn. The state sought to exclude altogether or limit Voorhees' expert's testimony. The court allowed the expert to testify about the effects of a combination of Prozac, methamphetamine, and alcohol in general, but not whether

this combination caused Voorhees to become involuntarily intoxicated on the night he killed Carolyn. At the end of trial, the court instructed the jury on the defense of involuntary intoxication. The jury found Voorhees guilty of first-degree premeditated murder. The court sentenced him to life imprisonment. Voorhees now appeals from that verdict.

Voorhees argues through counsel that he was denied his constitutional right to present a defense, that the district court erred in instructing the jury on the applicable law of involuntary intoxication, and that the state presented insufficient evidence of premeditation and insufficient evidence that Voorhees did not act in the heat of passion. Pro se, Voorhees also argues prosecutorial misconduct, error by the district court in failing to substitute his counsel, and ineffective assistance of trial counsel.

## I.

Voorhees' first contention is that the district court erred when it limited the testimony of: (1) Voorhees' expert, (2) Voorhees himself, and (3) Voorhees' cellmate. He contends that these errors denied him his constitutional right to a fair trial. The district court has broad discretion in determining what testimony to admit into evidence at trial. *See State v. Myers*, 359 N.W.2d 604, 609 (Minn.1984). However, a defendant has a constitutional right to due process in the form of a fair trial. *See State v. Reardon*, 245 Minn. 509, 513, 73 N.W.2d 192, 194–95 (1955). Included in this constitutional right is the right to present a complete defense. *See State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992).

### A. Limitation of Expert Testimony

Voorhees contends that the district court erred when it limited the testimony of his expert witness and that this limitation denied him his constitutional right to present a complete defense. The expert would have testified whether Prozac or

some combination of Prozac, methamphetamine, and alcohol caused Voorhees to become involuntarily intoxicated and that this involuntary intoxication rendered Voorhees mentally ill at the time he killed Carolyn. Voorhees asserts that, without this testimony, he was prevented from proving the mental illness prong of his proffered involuntary intoxication defense.

■ To prevail in asserting the defense of involuntary intoxication, a defendant must show three elements, each by a preponderance of the evidence. *See City of Minneapolis v. Altimus*, 306 Minn. 462, 472, 238 N.W.2d 851, 858 (1976); 10 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIG 7.04 (3d ed.1990). First, the defendant must show that he

(1) was compelled to take the intoxicating substance against [his] will [or] (2) was unaware that because of a particular susceptibility to it the substance would have a grossly excessive intoxicating effect upon [him][or] (3) was innocently mistaken as to the nature of the substance taken [or] (4) became unexpectedly intoxicated as a result of taking a medically prescribed drug.

*Altimus*, 306 Minn. at 470–71, 238 N.W.2d at 857; CRIMJIG 7.04.

■ Second, the defendant must show that

[his] intoxication was caused by the intoxicating substance in question and not by some other intoxicant.

*Altimus*, 306 Minn. at 470, 238 N.W.2d at 857; CRIMJIG 7.04.

■ Third, the defendant must show that at the time of the killing, he was temporarily mentally ill, as defined in Minn.Stat. § 611.026. *See Altimus*, 306 Minn. at 471–72, 238 N.W.2d at 857–58. Specifically, the defendant must show that he

was made so mentally deficient by reason of involuntary intoxication, that [he] did not understand the nature of the act and that it was wrong. This means that [he] must have failed to know what [he] was doing or what the consequences of the act would be, or [he] must have failed to realize that the act was wrong.

CRIMJIG 7.04; *see also* Minn.Stat. § 611.026; *Altimus*, 306 Minn. at 471–72, 238 N.W.2d at 857–58.

■ A defendant bears the burden of making a prima facie showing that he is entitled to a jury instruction on the defense of involuntary intoxication, included in which is the defense of mental illness.[2] *See State v. Martin*, 591 N.W.2d 481 (Minn. 1999). Our review of the record convinces us that Voorhees made no prima facie showing on any element of involuntary intoxication, such that he was entitled to a jury instruction on that defense. As to the first element, unexpected intoxication, we can glean no information from the record showing that Voorhees was involuntarily intoxicated or, as his expert puts it, in a "drug-induced psychosis" as a result of taking Prozac. By his own admission, Voorhees last took Prozac the Friday before the killing, which occurred in the early morning hours of Tuesday. The clerk who, approximately five hours before the killing, sold Voorhees the rifle used to kill Carolyn testified that Voorhees appeared to be coherent, in a good mood, and not under the influence of drugs or alcohol during the sales transaction. The bartender who served Voorhees drinks between 9:00 p.m. and midnight also testified that, at the time Voorhees left the bar, he did not appear to be drunk or under the influence of methamphetamine.

■ Voorhees was coherent enough to read the owner's manual for the rifle and figure out how to load it. He was coherent enough to decide to park his car a street

---

2. We note that the defendant's burden of making a prima facie showing that would entitle him to a jury instruction and the defendant's burden of proving to the trier of fact by a preponderance of the evidence each element of the defense proffered are two separate inquiries.

away from RSI, load the rifle while in the dark, then negotiate his way down a dark path to RSI, and shoot Carolyn 11 times, pulling the trigger each time he shot. After the killing, he was coherent enough to make the decision to call the police from a location where others would not be bothered by police cars arriving to arrest him. The audiotape of Voorhees' call to 911 reveals that he was calm when he made the call and that he was able to give the 911 operator information such as the location of the shooting, his own address, the address and telephone number of Carolyn's parents, and the location from which he was calling. After police officers apprehended Voorhees, he told them "I just did a horrendous crime and I understand that." This evidence in no way indicates that Voorhees was involuntarily intoxicated or in a "drug-induced psychosis." Thus, we conclude that Voorhees failed to make a prima facie showing that he was involuntarily intoxicated as a result of taking Prozac.

In addition, as to the second element—that Voorhees' intoxication was caused by Prozac and not some other intoxicant—the record is clear that, even if Voorhees was involuntarily intoxicated, it is impossible to ascertain whether his intoxication was caused by Prozac alone or by some combination of the Prozac, alcohol, and methamphetamine he ingested prior to the killing. Voorhees' own expert, in both his written pretrial report and his trial testimony, indicated that it was impossible for him to determine whether Prozac, alcohol, methamphetamine, or a combination of some or all of the three substances would have caused Voorhees to become involuntarily intoxicated. In fact, the expert testified that, in a situation where a person has taken a combination of Prozac and methamphetamine, he "would not opine that the Prozac is causing that. It's just directly related to the methamphetamine." We conclude that Voorhees made no prima facie showing that his involuntary intoxication, if any, was caused by Prozac and not some other intoxicant.

Voorhees is correct that his expert was precluded from testifying about his diagnosis of Voorhees and his opinion of Voorhees' mental capacity at the time of the killing and that, therefore, Voorhees was precluded from showing, through expert testimony, the third element of the involuntary intoxication defense—temporary mental illness. The type of opinion testimony Voorhees' expert would have offered, which dealt with Voorhees' mental capacity at the time he killed Carolyn, would have been properly admissible only during the second phase of a bifurcated trial. *See State v. Griese,* 565 N.W.2d 419, 425 (Minn.1997); *State v. Provost,* 490 N.W.2d 93, 98 (Minn.1992); *State v. Bouwman,* 328 N.W.2d 703, 705–06 (Minn.1982). Because Voorhees failed to make, through any other evidence, the required prima facie showing of mental illness, he was not entitled to a bifurcated trial where he might be afforded the opportunity to offer his expert's opinion in order to prove the mental illness prong of the defense.

Because we conclude that Voorhees failed to make a prima facie showing of temporary mental illness that would warrant a jury instruction on the defense of involuntary intoxication, we hold that the district court abused its discretion by instructing the jury on that defense. However, by instructing the jury on Voorhees' proffered defense, the court gave Voorhees more protection than he was entitled to receive. Despite the court's instruction on involuntary intoxication, the jury found Voorhees guilty of the premeditated first-degree murder of Carolyn. Therefore, we hold that reversal is not required on the grounds that Voorhees was denied his constitutional right to present a complete defense.

B. Limitation of Voorhees' Testimony

Voorhees next contends that he was precluded from testifying as to: (1) the side effects he experienced from Prozac and the combination of Prozac, alcohol, and

methamphetamine; (2) whether he was aware of any prohibitions against using alcohol or other drugs while taking Prozac; and (3) his state of mind at the time of the shooting. Our review of the record reveals that the district court made no such ruling. In fact, the court specifically ruled that after Voorhees' expert offered testimony about his knowledge of the use of Prozac or combinations of Prozac, methamphetamine, and alcohol, Voorhees could then, through his own testimony, "bring himself within the purview of the opinions expressed." Further, under direct examination and without objection, Voorhees testified about the effects he felt Prozac had on him, both in general and at the time of the killing, and about his state of mind at the time of the killing. Voorhees' counsel never asked Voorhees whether he was aware of any prohibition against taking alcohol or drugs while taking Prozac. Nevertheless, Voorhees did testify that he made a conscious choice to not take his Prozac at the same time he was ingesting methamphetamine and that he made this choice because he did not believe he should take both substances at the same time. Therefore, because his testimony was not precluded, we conclude there is no merit to Voorhees' argument and hold that reversal is not required on these grounds.

### C. Limitation of Voorhees' Cellmate's Testimony

Voorhees also argues that the district court erred in precluding the testimony of the person who was Voorhees' cellmate from approximately November 15, 1996 until approximately February 19, 1997. Voorhees asserts that the cellmate would have testified about his observations of Voorhees' demeanor and physical characteristics in jail both while Voorhees was taking some "medication" that was given to him from the jail's medication cart and after Voorhees stopped taking this "medication." It is undisputed that the cellmate did not have personal knowledge about what medication Voorhees took from the medication cart, would have relied on hearsay statements to establish what medication Voorhees was taking, and had no medical background on which to base his assessment of Voorhees' demeanor. The court considered arguments from both sides, then ruled that the cellmate's testimony would be precluded, finding the evidence irrelevant because it was too remote in both time and space from the killing and was nonprobative in that the cellmate was not in a position to testify, from a medical standpoint, what drugs Voorhees was taking or what effects and impact there would be on Voorhees from taking the drugs. We conclude that the district court acted well within its discretion when it ruled that the cellmate could not testify and that, thus, reversal on this ground is not warranted.

### II.

Voorhees next argues that the state did not present evidence sufficient to support the jury's verdict of guilty of premeditated first-degree murder and that the state failed to prove Voorhees did not act in the heat of passion. When considering whether the evidence in a case is sufficient to support a guilty verdict, we examine the evidence presented in the record, along with legitimate inferences from that evidence, to determine whether the jury could have concluded that the state met its burden of proving beyond a reasonable doubt that the defendant was guilty of the offense charged. *See State v. Moore*, 481 N.W.2d 355, 360 (Minn.1992). We review the evidence in the record "in the light most favorable to the jury's verdict and assume that the jury believed the state's witnesses and disbelieved contrary evidence." *Dale v. State*, 535 N.W.2d 619, 623 (Minn.1995); *see also State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). Any inconsistency in the evidence must be resolved in favor of the state. *See State v. Bergeron*, 452 N.W.2d 918, 924 (Minn. 1990).

Voorhees was convicted of premeditated first-degree murder, which is defined by statute as causing "the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn.Stat. § 609.185(1) (1998). Premeditation " 'indicates a preexisting reflection and deliberation involving more than a mere intent to kill.' " *State v. Buchanan,* 431 N.W.2d 542, 547 (Minn.1988) (quoting *State v. Lloyd,* 345 N.W.2d 240, 245 (Minn.1984)). The requisite premeditation can be formed instantaneously. *See State v. Buntrock,* 560 N.W.2d 383, 388 (Minn.1997).

Here, based on the evidence presented, the jury could have concluded beyond a reasonable doubt that Voorhees premeditated his killing of Carolyn and that he did not act in the heat of passion. Voorhees and Carolyn were in the process of a marriage dissolution that Voorhees did not want. When Voorhees noticed that Carolyn had purchased a douche at Wal–Mart, he suspected that she was sleeping with another man and became jealous. Shortly after speaking with Carolyn at Wal–Mart, Voorhees purchased the rifle he used to kill her. Jealousy is the reason Voorhees first gave to the police for purchasing the rifle and killing Carolyn.

After seeing Carolyn at Wal–Mart, Voorhees went home, walked his dog, read the owner's manual for the rifle so he could properly load it, and then changed into dark clothes. He drove to Carolyn's place of work where he knew she would be alone, parked his car a street away so she would not see him and call the police, loaded the rifle while in the dark, made his way down a dark path, watched Carolyn come out of the house, then shot her 11 times from several different angles with a rifle that required the trigger to be pulled each time a shot was fired. After the shooting, he left Carolyn lying on the ground to die and waited for approximately two hours before he calmly called 911 to report what he had done.

In sum, the evidence that Voorhees acted with premeditation and not in the heat of passion was substantial. Accordingly, we hold that, on the evidence presented, the jury could have concluded beyond a reasonable doubt that Voorhees premeditated Carolyn's killing and that he did not act in the heat of passion when he killed her.

### III.

In a supplemental pro se brief, Voorhees makes three additional arguments. He contends that he should be granted a new trial first, because the state committed prosecutorial misconduct; second, because the district court denied his request to substitute counsel; and third, because his trial counsel acted ineffectively and to Voorhees' prejudice.

### A. Prosecutorial Misconduct

Voorhees alleges five instances of prosecutorial misconduct. To succeed on these claims, Voorhees must show that prosecutorial misconduct occurred and that the misconduct was prejudicial. *See State v. Ashby,* 567 N.W.2d 21, 27–28 (Minn.1997). The determination of whether there was misconduct and whether that misconduct was prejudicial generally lies within the sound discretion of the district court, which is in the best position to measure its effect. *See id.* at 27. We will reverse only if the misconduct is "so serious and prejudicial that a defendant's right to a fair trial is denied." *State v. Smith,* 541 N.W.2d 584, 588 (Minn.1996).

Voorhees initially points to the grand jury proceedings and alleges two instances of what he believes to be prosecutorial misconduct. Voorhees first claims that a grand juror whose friend had dated Carolyn should not have been allowed to sit on the grand jury that indicted him. When the grand juror in question was asked if there was anything in his knowledge about the relationship between Carolyn and the grand juror's friend that would affect his impartiality serving as a grand

juror, the juror answered that he did not think so. We have held that a presumption of regularity attaches to the indictment process. *See State v. Inthavong*, 402 N.W.2d 799, 801 (Minn.1987). In the case before us, there is nothing in the record to suggest any bias on the part of this grand juror. Moreover, the fact that Voorhees was found guilty of premeditated first-degree murder by the petit jury, the makeup of which Voorhees does not challenge, confirms that probable cause existed as to Voorhees' guilt and negates any assertion of unfairness due to bias on the part of the grand juror. *See United States v. Mechanik*, 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (stating that conviction by a petit jury confirms that probable cause existed and that the defendant was guilty beyond a reasonable doubt of the crime charged). Thus, this assertion of prosecutorial misconduct lacks merit.

 Voorhees also claims that the state misled the grand jury by withholding "blood evidence" from the grand jury's consideration. Voorhees seems to claim that the state intentionally failed to send his blood to the BCA for testing and tampered with the blood, so that he was effectively denied the right to "test [his] own blood for Prozac." Voorhees made this same argument to the district court and the court considered, then rejected, his allegations. Further, the state tested Voorhees' blood for Prozac and evidence of the amount of Prozac found in Voorhees' blood at the time of his arrest was presented to the petit jury that convicted him. We conclude that this claim is without merit.

 Voorhees then turns his attention to the trial. He argues that the state improperly cross-examined him by reminding him of his testimony that he was, or used to be, a religious person, and then asking him to recite the commandment, "Thou shalt not kill." Rule 610 of the Minnesota Rules of Evidence provides that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible *for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced*" (emphasis added). We can discern no evidence that the state asked Voorhees to recite the commandment for the purpose of impairing his credibility. Further, no objection to this question was raised at trial. We conclude the issue is waived and also lacks merit.

Voorhees also takes issue with an "accusatory question" posed to him by the state on cross-examination. The prosecution asked Voorhees whether he told a friend that he thought about shooting Carolyn. The record reveals that the state had a good-faith basis for asking this question. Further, defense counsel did not object to this question at trial, thereby waiving the issue.

 Voorhees next asserts that prosecutorial misconduct occurred during closing arguments when the state showed the jury a picture of Carolyn's blood-stained hand and stated that Voorhees had "blood on [his] hands." Defense counsel objected to the statement, which was one statement in 45 minutes of the state's closing argument, and the district court cautioned the state to refrain from making further "unnecessary euphemisms." The court considered and then rejected Voorhees' argument on this point both at trial, when Voorhees' counsel requested a mistrial based on the allegedly improper statement, and again after the jury's verdict was announced but before Voorhees was sentenced. We are convinced that the court did not abuse its discretion when it denied the defense's motion for a mistrial on these grounds.

We conclude that none of the instances cited by Voorhees constitute prosecutorial misconduct. Accordingly, we hold that Voorhees' claims of prosecutorial misconduct are without merit.

## B. Failure to Substitute Trial Counsel

 Voorhees next contends that the district court erred by refusing to

grant his request to substitute a new public defender as his trial counsel. Substitute counsel will be appointed " 'only if exceptional circumstances exist and the demand is timely and reasonably made.' " *See State v. Worthy*, 583 N.W.2d 270, 278 (1998) (quoting *State v. Vance*, 254 N.W.2d 353, 358 (Minn.1977)). Voorhees' reason for requesting the substitution was, "I have been belittled, yelled at, in my trauma through this." The district court told Voorhees that the fact that he and his counsel experienced some "personal tension" during the trial preparation phase did not entitle Voorhees to new counsel. Specifically, the court stated, "Sometimes your attorney is going to have to be very blunt and very honest with you and he's going to say things that you're not going to like to hear. But those matters don't go to issues of ability or competence to represent you." We agree with the court's statement and, accordingly, we hold that the court did not err when it refused to substitute Voorhees' trial counsel.

C. Ineffective Assistance of Trial Counsel

██ Finally, Voorhees asserts that he should be granted a new trial because his trial counsel acted ineffectively and to Voorhees' prejudice. The United States Supreme Court has articulated a two-pronged analysis for determining whether a defendant should be granted a new trial because of his counsel's alleged deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The two prongs of the *Strickland* test are the deficiency prong and the prejudice prong. *See id.*

██ Under the deficiency prong, a defendant must show that his counsel's performance was deficient, that his counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052; *Gates v. State*, 398 N.W.2d 558, 561 (Minn.1987). In Minnesota, an attorney acts within that objective standard of reasonableness when he provides his client with the "representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *State v. Gassler*, 505 N.W.2d 62, 70 (Minn.1993) (internal quotation and citation omitted). What evidence to present to the jury, including which defenses to raise at trial and what witnesses to call, represent an attorney's decision regarding trial tactics which lie within the proper discretion of trial counsel and will not be reviewed later for competence. *See State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986). Under the prejudice prong, a defendant must show that his counsel's error, whether or not "professionally unreasonable," so prejudiced the defendant at trial that a different outcome would have resulted but for the error. *Strickland*, 466 U.S. at 691, 694, 104 S.Ct. 2052.

██ None of the grounds raised by Voorhees constitute ineffective performance under the deficiency prong of the *Strickland* test. Voorhees' arguments that his trial counsel did not file a motion for a change of venue when Voorhees wanted the motion filed and that his counsel failed to call certain witnesses in Voorhees' defense and cross-examine the state's witnesses all represent matters of trial strategy that we will not review for competence. *See Jones*, 392 N.W.2d at 236. Voorhees' argument that he should have been given the opportunity to testify in front of the grand jury and that his counsel did not allow him to do so fail first, because the grand jury never called Voorhees to testify, and second, because Voorhees did testify in front of the petit jury, which found him guilty. *See Mechanik*, 475 U.S. at 70, 106 S.Ct. 938. There is no evidence in the record to support Voorhees' argument that his counsel failed to procure part of the blood sample that was sent to the BCA so that Voorhees could have the blood examined by his own lab. The record indicates that the blood sample referenced by Voorhees had been depleted during the state's testing to the point that no further testing was possible. In sum,

we hold that Voorhees' claims of ineffective assistance of counsel are without merit.

Affirmed.