Brad Alan VOORHEES, Petitioner,
Appellant,

v.

STATE of Minnesota, Respondent.

No. C5–00–1892.

Supreme Court of Minnesota.

June 21, 2001.

Rehearing denied July 20, 2001.

Brad Alan Voorhees, Bayport, pro se.

Mike Hatch, Atty. Gen., Robert A. Stanich, Asst. Atty. Gen., St. Paul, Alan L. Mitchell, St. Louis County Atty., Duluth, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

In 1998, a St. Louis County jury found appellant Brad Alan Voorhees guilty of

first-degree premeditated murder and he was sentenced to a mandatory term of life in prison. We affirmed Voorhees' conviction in *State v. Voorhees*, 596 N.W.2d 241 (Minn.1999). Voorhees then filed a pro se petition for postconviction relief alleging violations of due process at trial and on appeal, errors in jury instructions, newly-discovered evidence, misconduct on the part of the prosecutor, violation of his right to effective assistance of trial and appellate counsel, and insufficient evidence of premeditation. The postconviction court denied relief, concluding that Voorhees raised only claims that he had already raised or could have raised in his direct appeal and that the evidence did not support his ineffective assistance of counsel claim. On appeal, Voorhees argues that the postconviction court abused its discretion in denying his petition without conducting an evidentiary hearing or granting a new trial, that he was denied his constitutional right to appointment of effective counsel throughout his proceedings, and that the postconviction court abused its discretion in dismissing his petition without issuing findings of fact and conclusions of law. We affirm.

A detailed statement of facts can be found in *State v. Voorhees*, 596 N.W.2d 241 (Minn.1999); therefore, we will set out only the facts relevant to this appeal. At approximately 2:00 a.m. on August 6, 1996, Voorhees drove to his wife Carolyn's place of employment and parked his car one street over from her workplace so that his wife would not see him. After parking his car, Voorhees took a rifle from the trunk, loaded the rifle, and walked through a wooded area to the house where his wife worked. When his wife came out of the house to have a cigarette, Voorhees shot her 11 times. Voorhees has never denied that he killed his wife.

Trial testimony and Voorhees' statements to police recreate the troubled state of the Voorhees' marriage and the events leading up to the homicide. Brad and Carolyn Voorhees were married in 1993. During the time they were married, several close relatives of the couple died. Voorhees was especially troubled by the death of his brother in May 1996, and this loss took a toll on the marriage. In July 1996, Carolyn Voorhees moved out of their home and subsequently served Voorhees with marital dissolution papers. During this time, Voorhees was taking a prescribed amount of the drug Prozac on a daily basis and was drinking alcohol regularly. Voorhees testified that he called his wife approximately one week before he killed her and told her that he was going to commit suicide by taking pills. She responded by telling him that he would "just end up brain dead" if he tried to kill himself that way.

On Friday, August 2, Voorhees purchased an "eight-ball" of crank, which is a form of methamphetamine. His Prozac had run out, but he did not immediately refill his prescription because he did not think he should be taking Prozac while ingesting methamphetamine. Voorhees testified that throughout the weekend he continued to ingest methamphetamine and drink alcohol and that he was unable to sleep.

Voorhees further testified that on Monday, August 5, he spent the day lying in bed, depressed and unable to sleep. At approximately 6:00 p.m., he left his home, finished the last of the methamphetamine, and then decided he needed to "snap out of this and * * * get straight." After visiting a former employer, who told Voorhees he would be rehired when a job opened up, Voorhees proceeded to Wal Mart to get his Prozac prescription filled. Voorhees arrived at Wal Mart between 8:00 and 8:30

p.m., and noticed his wife's car in the parking lot.

When Voorhees entered the store, he saw his wife and a female friend in the checkout line. Voorhees waited for them to finish checking out, and noticed that one of the items his wife was purchasing was a douche. Voorhees asked to speak to his wife and she told him to sign the marital dissolution papers and leave her alone. The two women then left the store, and Voorhees accompanied them to the parking lot, continuing to speak to his wife for approximately 20 minutes regarding their impending marital dissolution and finances. When Voorhees asked his wife if she was seeing someone else, she did not respond.

After his wife left the parking lot, Voorhees drove to a bar, where he had a mixed drink. He testified that he felt that he had nothing to live for and thought about what his wife said would happen to him if he tried to commit suicide. Voorhees testified that it was at this point that the thought of "a gun popped into my mind, that I couldn't fail with a gun." At approximately 9:05 p.m., Voorhees drove back to Wal Mart, went to the gun department, filled out the required paperwork, and bought a .22 caliber semi-automatic Marlin rifle and a box of 50 rounds of ammunition. The clerk who sold Voorhees the rifle testified that it took approximately 20 minutes for Voorhees to complete the purchase of the rifle. The clerk further testified that Voorhees was coherent and in a good mood and did not appear to be under the influence of alcohol or drugs.

Voorhees then proceeded to a second bar, where he recalls drinking two or three mixed drinks and five to six beers. However, the bartender who served Voorhees testified that he served Voorhees one mixed drink and three or four beers between the hours of 9:00 p.m. and midnight.

The bartender also testified that Voorhees did not appear to be drunk or on methamphetamine when he left the bar.

Voorhees testified that he returned to his home with the intent to shoot himself while in the home. He then let his dog out, brought the rifle inside, and changed into dark clothing. Voorhees left a message on his answering machine stating that it was the last message he would ever leave and that he was sorry. He read the owner's manual for the rifle and walked around, looking at pictures and at the rings his wife had left behind. He also wrote a note to his mother that read: "MOM I LOVE You—SoRRY!! LOVE BRAD ALWAYS—8-6-96 2 AM." On the back of a church bulletin, he wrote: "To Who EVER REALY [sic] *CAREs*—I hope you hAVE A Good liFE! LET This BE A lESSON TO EVERYBoDy ABouT MARRIAGE." Voorhees testified that at that point he decided to shoot himself in front of his wife and he "headed for where she works."

Voorhees testified that as he approached his wife's workplace through the woods and across a field, his wife came out of the house and lit a cigarette. When she turned around and saw him standing there, he testified that she yelled at him to go away and that there was someone else and she did not love him. Voorhees then shot her 11 times, pulling the trigger until the gun stopped going off. After shooting his wife, Voorhees ran up the path to his car, dropping the rifle along the way. Neighbors reported hearing screaming and several pounding or "popping" noises around the time of the homicide.

Voorhees drove to a store and called his sister-in-law. Voorhees then drove to the Spirit Mountain Motel, where he threw away the empty rifle box and the receipt from the purchase of the rifle. At 4:13 a.m., he called 911 from a rest area. Dur-

ing this call, Voorhees told the 911 operator that he had shot his wife 11 times and he explained where her body could be found and the location from which he was calling. The operator kept Voorhees on the phone until officers arrived to arrest him.

The arresting officers reported that Voorhees initially appeared calm and sober. After he was handcuffed and placed in the squad car, he broke down and began to cry. Beginning with his arrest, Voorhees made several taped statements to police during interviews in which he repeatedly confessed to killing his wife. In one of these interviews, Voorhees was asked whether he was thinking about killing her when he had purchased the rifle earlier in the evening and he replied "I don't know, to tell you the truth. Why would you buy a gun? But I don't know. I—I—I—I was just … I was in like a state of jealousy." Voorhees repeatedly mentioned the marital dissolution and how, because of the douche his wife purchased, he thought she was sleeping with someone else. Voorhees did not mention any suicidal intentions in these initial interviews. It was not until an interview at 9:27 a.m. that Voorhees stated that he had planned to kill himself in front of his wife when he went to her workplace.

As part of the investigation, blood and urine testing was performed. At 4:53 a.m. on the day of the shooting, Voorhees' blood alcohol level was .03. At trial, an expert extrapolated that, assuming Voorhees stopped drinking by 1:30 a.m., his blood alcohol level at the time of the killing would have been between .065 and .07. Blood and urine samples taken from Voorhees approximately 2 ½ hours later, at 7:25 a.m., revealed no methamphetamine in his blood, an undetermined amount of methamphetamine in his urine, and no alcohol in his blood. Appellant's blood con-

tained 154 nanograms/milliliter of Prozac. The therapeutic range for Prozac is 300–1150/milliliter.

At trial, Voorhees asserted the defense of involuntary intoxication. As a part of this defense, Voorhees submitted the report of a psychologist who had evaluated Voorhees on July 8, 1997, after jury selection had begun. The defense submitted the psychologist's report as its offer of proof that, on the night of the murder, Voorhees had become involuntarily intoxicated through his ingestion of a combination of Prozac, methamphetamine, and alcohol. The district court allowed the psychologist to testify about the effects of combining the substances in general, but did not allow testimony as to whether this particular combination caused Voorhees to become involuntarily intoxicated that night.

At the end of the trial, the district court instructed the jury on the defense of involuntary intoxication by means of becoming unexpectedly intoxicated from a "medically prescribed drug," but excluded instructions on three types of involuntary intoxication not at issue in the case. In addition, the court advised the jury to consider only the Prozac and not the effects of alcohol or methamphetamine when considering the defense of involuntary intoxication. The jury found Voorhees guilty of first-degree premeditated murder and he was sentenced to life in prison.

Voorhees appealed and argued through counsel that he was denied his constitutional right to present a defense, that the district court erred in the jury instruction on involuntary intoxication, and that the state presented insufficient evidence of premeditation and insufficient evidence that Voorhees did not act in the heat of passion. Voorhees also submitted a pro se brief arguing prosecutorial misconduct, ineffective assistance of trial counsel, and

error by the court in failing to substitute his trial counsel. *Voorhees*, 596 N.W.2d at 249. We affirmed the conviction and subsequently denied Voorhees' pro se petition for rehearing. *Id.* at 245.

Voorhees filed a pro se petition for postconviction relief supported by a memorandum of law. In this petition, Voorhees raised the following arguments: (1) denial of due process of law in being convicted and sentenced without a Rule 20 Mental Competency Hearing; (2) denial of his right to a fair trial because the district court failed to sua sponte instruct the jury on voluntary intoxication; (3) denial of the right to a fair trial because the district court erred in jury instructions as a whole, including the omission of key wording in the heat of passion instruction; (4) denial of due process and the right to a fair trial because newly-discovered evidence shows that the state violated discovery rules in handling the blood evidence; (5) denial of due process and the right to a fair trial due to prosecutorial misconduct; (6) denial of due process and equal protection rights in this court's treatment of the issues and the record in his direct appeal; (7) ineffective assistance of trial counsel; (8) ineffective assistance of appellate counsel; and (9) insufficient evidence to substantiate premeditation. The state submitted a responsive memorandum. After consideration of the parties' memoranda and hearing oral argument, the postconviction court denied Voorhees' petition, concluding that Voorhees raised only issues that had been raised or could have been raised on direct appeal and that the evidence did not support Voorhees' ineffective assistance of counsel claim.

Voorhees' appeal to this court raises three main arguments: abuse of discretion by the postconviction court in denying Voorhees' petition without conducting an evidentiary hearing or granting a new trial; denial of his constitutional right to appointment of effective counsel; and abuse of discretion by the postconviction court in not making findings of fact and conclusions of law.

## I.

■ As a petitioner for postconviction relief, Voorhees has the burden of establishing, by a fair preponderance of the evidence, the facts alleged in his postconviction petition. Minn.Stat. § 590.04, subd. 3 (2000). On appeal, a postconviction court's decision will not be disturbed absent an abuse of discretion. *Hodgson v. State*, 540 N.W.2d 515, 517 (Minn.1995). We examine each of Voorhees' claims of error by the postconviction court in light of this standard.

■ Voorhees asserts several different claims in support of the argument that the postconviction court abused its discretion in failing to conduct an evidentiary hearing or grant a new trial. Specifically, Voorhees makes three separate claims of ineffective assistance of counsel, a claim with respect to blood evidence, and a claim regarding jury instructions. A postconviction court is not required to conduct an evidentiary hearing when the petition for postconviction relief and the record "conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2000). However, an evidentiary hearing is necessary "whenever material facts are in dispute that * * * must be resolved in order to determine the issues raised on the merits." *Hodgson*, 540 N.W.2d at 517. Any doubts as to whether an evidentiary hearing should be conducted are to be resolved in favor of the party requesting the hearing. *State ex rel. Roy v. Tahash*, 277 Minn. 238, 244, 152 N.W.2d 301, 305 (1967).

## A. *Ineffective Assistance of Counsel*

■ Voorhees argues that the post-conviction court erred in not conducting an evidentiary hearing on his ineffective assistance of trial and appellate counsel claims. In order to succeed on his ineffective assistance of counsel claims, Voorhees must demonstrate that his counsels' performance "fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel[s'] errors." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We consider an attorney's actions to be "within the objective standard of reasonableness when [the attorney] provides [the] client with 'the representation of an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under the circumstances.'" *State v. Doppler*, 590 N.W.2d 627, 633 (Minn. 1999) (citation omitted). There is a strong presumption that counsels' performance was reasonable. *State v. Jones*, 392 N.W.2d 224, 236 (Minn.1986).

### 1. *Failure to Request Stay and Remand*

■ Voorhees first contends that appellate counsel should have moved to stay his direct appeal and remand the matter to a postconviction court. He asserts a remand is required to allow for an evidentiary hearing in order to further develop the record to determine whether his trial counsel's assistance was deficient. As support, Voorhees relies on *State v. Gustafson* where we declined to decide the merits of an ineffective assistance of trial counsel claim on direct appeal, stating that such a claim should be raised in a petition for postconviction relief. 610 N.W.2d 314, 321 (Minn.2000).

■ In *Gustafson*, we did not mandate that all ineffective assistance of trial counsel claims be decided only in the context of postconviction relief. Rather, we will consider such a claim on direct appeal, without the benefit of a postconviction evidentiary hearing, when an appellant requests that we do so. *Roby v. State*, 531 N.W.2d 482, 484 n. 1 (Minn. 1995). Furthermore, a postconviction hearing is necessary only when the record is not sufficient to allow proper review of the ineffective assistance of trial counsel claim. *See Dukes v. State*, 621 N.W.2d 246, 255 (Minn.2001) (concluding that ineffective assistance of counsel claims requiring evidence of attorney-client communications are properly raised in a postconviction petition). Here, the record on direct appeal was sufficient to determine the ineffective assistance of trial counsel claim without any additional fact finding. Thus, Voorhees' appellate counsel did not act unreasonably in going forward with the direct appeal rather than seeking a stay to allow Voorhees' pro se argument of ineffective assistance of trial counsel to be developed in a postconviction proceeding.

### 2. *Failure to File Petition for Rehearing*

■ Voorhees also argues, as a basis for his ineffective assistance of appellate counsel claim, that his counsel failed to file a petition for rehearing following his direct appeal and he was forced to pursue the matter pro se. For purposes of this claim, we may first analyze whether Voorhees was prejudiced by any potential mistake of his appellate counsel so that, if no actual prejudice is found, we need not evaluate counsel's performance. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052. Here, Voorhees makes no attempt to show prejudice and the record does not substan-

tiate such a claim. Accordingly, this claim lacks merit.

### 3. Choice of Defense

Voorhees asserts that he was denied any real defense at trial and denied the opportunity to argue as much on direct appeal. This argument really intertwines two claims: that Voorhees was denied effective assistance of counsel because his trial counsel erred in arguing the defense of involuntary intoxication, when the "only line of defense was towards intent through voluntary intoxication and mental illness"; and that he was denied effective assistance because his appellate counsel erred in failing to raise the issue of ineffective assistance of trial counsel on direct appeal.

The state argues that the underlying ineffective assistance of trial counsel claim is procedurally barred because it was raised on direct appeal. Once a direct appeal has been taken, we will not consider any issues raised in that appeal or any claims known at that time but not raised. *Miller v. State*, 531 N.W.2d 491, 493 (Minn.1995); *State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976). We will allow exceptions to this rule as

fairness requires when a claim is so novel that the legal basis for the claim was not reasonably available on direct appeal and when the petitioner did not "deliberately and inexcusably" fail to raise the claim. *Fox v. State*, 474 N.W.2d 821, 824–25 (Minn.1991) (citation omitted).

Voorhees acknowledges that he briefed his ineffective assistance of trial counsel claim on direct appeal, but asserts that the claim is not barred because on direct appeal he did not specifically raise and this court did not specifically address the choice of defense issue. However, Voorhees knew of and even referred to the alternate defenses of voluntary intoxication and mental illness at the time of direct appeal.[1] Because the choice of defense issue was known to Voorhees at the time of his direct appeal, he is barred from raising the claim here.[2] *Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741.

Nonetheless, because Voorhees' ineffective assistance of appellate counsel claim is predicated on the underlying ineffective assistance of trial counsel claim, we examine the trial counsel claim under the two-prong *Strickland* test. If

---

1. It is not entirely clear whether Voorhees is arguing that he should have had a stand-alone mental illness defense under Minn.Stat. § 611.026 (2000) or is claiming that mental illness would have augmented a voluntary intoxication defense to intent. Regardless, the claim is barred. On direct appeal, we considered evidence of mental illness as an element of Voorhees' defense of involuntary intoxication and concluded that Voorhees failed to make a prima facie showing of mental illness that would have entitled him to a bifurcated trial and further development of the issue. *Voorhees*, 596 N.W.2d at 251. If Voorhees' argument is that a mental illness defense should have been argued differently, he knew of and could have raised the issue on direct appeal. Furthermore, voluntary intoxication does not include a mental illness component. *See* Minn.Stat. § 609.075 (2000).

2. Voorhees also argues that his ineffective assistance of trial counsel claim should not be procedurally barred because on direct appeal this court should have remanded his case to the postconviction court for a full evidentiary hearing, as in *Gustafson*. As previously noted, in *Gustafson* we did not mandate that all ineffective assistance of trial counsel claims be decided in the context of postconviction relief. 610 N.W.2d at 321. Voorhees raised the issue of ineffective trial counsel on direct appeal, knew of and alluded to the choice of defense argument at that time, and, unlike in *Gustafson*, we did not require further development of the record in order to decide the issue. *See id.* Accordingly, this argument does not prevent us from applying the *Knaffla* rule to bar consideration of Voorhees' ineffective assistance of trial counsel claim.

Voorhees cannot establish that he was denied effective assistance of trial counsel on the choice of defense issue, then his appellate counsel claim as to this point of error also fails. *Sullivan v. State*, 585 N.W.2d 782, 784 (Minn.1998). As we stated when we reviewed his counsel's performance on direct appeal, matters of trial strategy, including which defenses to raise at trial, will not be reviewed later for competence. *Voorhees*, 596 N.W.2d at 255. Because we previously concluded that Voorhees' trial counsel's performance was not deficient, Voorhees' claim that his appellate counsel erred in failing to challenge trial counsel's tactical decisions on direct appeal is also without merit. *Sullivan*, 585 N.W.2d at 784. Accordingly, we conclude that the postconviction court did not abuse its discretion in denying Voorhees postconviction relief on this ineffective assistance of counsel claim or on his two other ineffective assistance of counsel claims.

### B. *Blood Evidence*

 Voorhees also argues that the postconviction court had a duty to conduct a full evidentiary hearing on newly-discovered evidence relating to the testing of his blood which, he asserts, establishes that the state suppressed evidence in violation of Minn.R.Crim.P. 9.01 and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Although he did not cite the proper authority, Voorhees made similar arguments regarding the state's use of the blood evidence in his pro se brief on direct appeal, which we rejected. *Voorhees*, 596 N.W.2d at 255–56.

Notwithstanding his arguments on direct appeal, Voorhees attempts to insert a new twist into his blood evidence argument. Here, Voorhees argues that our decision on direct appeal was based on an incomplete record because the blood sample was not actually depleted during pre-

trial testing. His support for this contention is a letter received from the Duluth Police Department dated March 20, 2000, and the attached evidence reports for Voorhees' blood and urine samples. However, Voorhees does not explain how these documents indicate that the blood sample was not depleted or how these documents in any way change the claim previously made on direct appeal. The documents merely refer to activity that occurred on August 6, 1996 and January 23, 1997 long before the trial and subsequent appeal. Thus, Voorhees has not established that his present argument presents a different question than that already raised on direct appeal. Because Voorhees raised the argument regarding the treatment of blood evidence on direct appeal, we conclude that this claim is procedurally barred. *Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741.

### C. *Jury Instructions*

Voorhees contends that he was denied a fair trial and thus deserves a new trial because the district court, in its jury instruction on involuntary intoxication, limited the jury to considering only the effect of Prozac and not the combined effects of alcohol and methamphetamine. He further argues that the court erred in failing to sua sponte instruct the jury as to the effects of voluntary intoxication on the elements of intent and premeditation. As a result, Voorhees claims that the jury was left with no instruction on how to consider evidence of his consumption of alcohol and methamphetamine.

 Voorhees raised the issue of the district court's modification and limitation of the involuntary intoxication jury instruction on direct appeal; therefore, we need not consider the issue here. *Id.* Furthermore, even though we did not specifically address the jury's inability to consider the combined effect of the substances on Voo-

rhees, we determined that Voorhees was not entitled to any instruction on the defense of involuntary intoxication and thus received even greater protection than the record warranted. *Voorhees*, 596 N.W.2d at 251.

In a closely-related argument, Voorhees argues that the district court should have sua sponte instructed the jury as to voluntary intoxication so that the jury could consider the effects of the alcohol and methamphetamine he had consumed on his ability to form the requisite intent for first-degree murder. The issue of whether the court should have instructed the jury as to the effects of alcohol and methamphetamine on intent and premeditation was known on direct appeal and argued by Voorhees in his supplemental brief. Despite Voorhees' current attempt to argue the issue from a slightly different perspective, the underlying claim was known to Voorhees at the time of direct appeal. Therefore, we conclude that this claim is procedurally barred and that the postconviction court did not abuse its discretion in dismissing Voorhees' claim that the district court should have sua sponte instructed the jury as to voluntary intoxication. *Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741.

With respect to each of the grounds asserted as a basis for requiring an evidentiary hearing or a new trial, Voorhees either raised or could have raised the issue on direct appeal or Voorhees has failed to put forth sufficient evidence to warrant an evidentiary hearing. Thus we hold that the postconviction court did not abuse its discretion in dismissing Voorhees' petition for postconviction hearing without conducting an evidentiary hearing or granting a new trial.

## II.

Voorhees also briefly argues that he was denied effective assistance of counsel throughout his proceedings because the district court failed to substitute his trial counsel and did not grant Voorhees' motion for appointment of counsel for postconviction proceedings. We considered and rejected Voorhees' substitution of trial counsel argument on direct appeal. Because this argument was raised on direct appeal, we will not revisit the argument in this proceeding. *Knaffla*, 309 Minn. at 251, 243 N.W.2d at 741. Moreover, Voorhees is not entitled to court-appointed counsel on postconviction relief once he has exercised that right in a direct appeal. Minn.Stat. § 590.05 (2000) (stating that indigent persons may apply for representation by a state public defender to pursue postconviction relief "if the person has not already had a direct appeal"). Accordingly, we hold that the postconviction court did not abuse its discretion in denying Voorhees relief on this claim.

## III.

Finally, Voorhees argues that the postconviction court abused its discretion in summarily denying all relief without issuing findings of fact or conclusions of law. Citing Minn.Stat. § 590.04, subd. 1 (2000), and *Scruggs v. State*, 484 N.W.2d 21 (Minn.1992), Voorhees contends that the postconviction court was required to make findings of fact and conclusions of law following the hearing on his postconviction petition.

When the postconviction court determines that an evidentiary hearing on a postconviction petition is warranted, Minn. Stat. § 590.04, subd. 1, requires the court to "make findings of fact and conclusions of law" as to the issues. *Cf. Scruggs*, 484 N.W.2d at 25 (stating that if a court deems it necessary to conduct a hearing on postconviction relief, "it should follow that hearing with findings of fact and conclu-

sions of law on each of the points raised on appeal"). Here, however, the postconviction court considered Voorhees' petition and the memoranda submitted by both parties and, after oral argument, concluded that the record did not warrant an evidentiary hearing. This nonevidentiary hearing does not invoke the requirement that findings of fact and conclusions of law be issued. We hold that it was not an abuse of the postconviction court's discretion to deny Voorhees' petition for postconviction relief without findings of fact and conclusions of law when the record conclusively supports the denial of postconviction relief.

Affirmed.