STATE of Minnesota, Respondent,

v.

Theodore Sherman ASHBY, Appellant.

No. C2–96–1567.

Supreme Court of Minnesota.

July 10, 1997.

John M. Stuart, Minnesota State Public Defender, Ann McCaughan, Asst. State Public Defender, Minneapolis, for Appellant.

Hubert H. Humphrey, III, Minnesota Attorney General, St. Paul, Midhael D. Freeman, Hennepin County Attorney, Gayle C. Hendley, Asst. Hennepin County Attorney, Minneapolis, for Respondent.

## OPINION

BLATZ, Justice.

This is an appeal by Theodore Ashby from his conviction for first-degree murder in the shooting death of Leslie Wayne Bryant in the early morning hours of September 10, 1995, in Minneapolis. Ashby was convicted by a Hennepin County jury on May 3, 1996. Ashby raises several issues: (1) that he was deprived of the right to present a defense when the trial court excluded certain evidence that Ashby claims established that a

third party in fact did the shooting; (2) that the evidence was insufficient as a matter of law to sustain the verdict; and (3) that he was denied the right to a fair trial when the prosecutor committed misconduct during his closing arguments. In a supplemental pro se brief, Ashby, who is African–American, alleges that he was denied the right to be tried by a jury of his peers because there were no people of color on his jury. We affirm.

On the evening of Saturday, September 9, 1995, the appellant Theodore Ashby went to the apartment of his girlfriend, Shanita Young. Young lived at 3117 Sixth Street North, Apartment 1, in Minneapolis. Living in the apartment with Young were her child, her roommate Ivy Love, and Love's child. Living across the hall, in Apartment 2, were Michelle Schwab, Michelle's foster brother, Shawn Johnson, and Wendy O'Donnell, as well as several children. Apartments 1 and 2 were the only two apartments on the lower level of the building. Ashby was a friend of the Schwab family, through Michelle's brothers, Reggie and Jeremy. Leslie Wayne Bryant, the decedent, was also a friend of the Schwab family and had been dating Michelle's sister for several years.

When Ashby arrived at Young's apartment, Reggie Schwab and Bryant were already there. At some point in the evening, Bryant and Ashby began arguing, calling each other names, and insulting each other's gangs—Ashby was a Crip and Bryant was a Vice Lord. The fight soon escalated into a fist fight, which was broken up by Reggie Schwab. However, Bryant clearly won the fight, and Ashby was fairly beaten up.

After the fight ended, Ashby exited Young's apartment and left the building. As Ashby left, he indicated that he would return. Reggie Schwab went across the hall to Michelle Schwab's apartment. Bryant also left Young's apartment, although it is not clear if he left with Ashby. A little while later, Bryant returned to Young's apartment to use the telephone. When he finished, the doorbell rang, and Bryant went to answer it. Seconds later, Bryant was shot several times as he stood in the entryway of the apartment building. The shooting occurred at about 3:30 a.m., Sunday, September 10, 1995.

One of the last people to see Bryant before he was shot, and the only one who was available to testify, was Michelle Schwab's oldest daughter Deja, who was 8 years old at the time. Deja was familiar with Bryant because he was dating her aunt, Raejon Schwab. Bryant and Raejon Schwab had a 3–year–old daughter, Tonisha, who was also spending the evening in Michelle Schwab's apartment. At some point during the night, Bryant came into the apartment and announced, "Michelle, I just kicked Teddy's butt, I just kicked butt." He then told his daughter to put on her shoes. He apparently changed his mind and left to return to Young's apartment. Subsequently, Deja, who had fallen asleep, was awakened by her mother. Then Shawn Johnson asked Deja to go get the cordless telephone from Bryant, who had apparently taken it with him.

Deja left the lower level apartment and was headed toward the front door, where she saw Bryant and Ashby. As she placed her foot on the first step up to the front doorway, she heard Ashby say, "All I want is an apology, all I want is an apology." She heard Bryant reply, "Okay, man. Be cool. Be cool." She then heard gun shots and immediately turned and ran back to the apartment. Deja did not actually see the shooting and could not see Ashby's hands because Bryant was standing in front of Ashby. At the trial, she testified that she heard the shots coming from the left of the front door, where Ashby was standing.

Deja also saw a third man, who was standing outside by a tree. She testified that she did not recognize this third man, but could describe him with some detail. At previous hearings and interviews, Deja made conflicting statements about exactly how many men were standing in the entryway at the time of the shooting and these statements were admitted into evidence at trial. Shortly after the shooting, Deja told police that Shawn Johnson and the unidentified third man were both standing in the entryway with Ashby and Bryant. Later that day, Deja made a statement to police which seemed to indicate that only the unidentified third man was standing in the entryway with Bryant and Ashby. When asked about these statements

at trial, Deja was certain that she had made a mistake and was sure that only Ashby was standing in the entryway with Bryant.

According to the medical examiner, Bryant was shot several times on the left side of his body. From the type of wounds and the markings around them, the medical examiner concluded that the gun was shot at close range, within a couple of feet of Bryant, but was not in contact with Bryant's body when it was fired. In addition, the location of shell casings found by the police indicated that the shooter was standing very close to Bryant. No weapon was recovered.

After the shooting, Ashby disappeared for a month. The police made several attempts to locate him during that month, but were unsuccessful. On October 10, 1995, Ashby turned himself in.

Ashby was charged with first- and second-degree murder, Minn.Stat. §§ 609.185(1) & 609.19(1) (1994) and was tried before a Hennepin County jury in April 1996. The prosecution's theory was that the murder was committed to revenge Bryant's beating up Ashby in front of Ashby's girlfriend and for Bryant's disrespecting Ashby's gang. The defense's primary theory was that someone other than Ashby committed the murder. The defense also focused on the inconsistencies contained in Deja's statements regarding exactly how many people were standing in the entryway when Bryant was shot. The jury convicted Ashby of first-degree murder. Ashby now appeals.

██ Ashby first claims he was denied the right to present a defense because certain evidence that someone else committed the murder was not admitted. This evidence included an alleged statement by Neilyn Wright admitting that he was letting Ashby take the fall for something Wright had done; Wright's prior convictions for illegal posses-

sion of weapons; and a statement by Michelle Schwab that she had heard that the Crips wanted Bryant dead. Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed unless there was a clear abuse of discretion. *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990).

██ The first evidence Ashby claims he should have been allowed to introduce was the testimony of Travoire Gaston that, in a brief conversation at the Hennepin County Workhouse, Wright accepted responsibility for the murder.[1] Generally, evidence on collateral issues is not admissible; nevertheless, when the issue is whether the defendant in fact did the killing, evidence that another person did the killing is admissible. *State v. Hawkins*, 260 N.W.2d 150, 158 (Minn.1977). The purpose of the evidence "is not to prove the guilt of the other person, but to generate a reasonable doubt of the guilt of the defendant." *Id.* at 158–59. Before such evidence may be admitted, however, a proper foundation must be laid. *Id.* at 159.

> "The rule is that [evidence of such acts] by a third person * * * may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime." * * * That is, evidence tending to incriminate another is inadmissible in the absence of proof of facts to connect that person with the crime. This requirement avoids the use of bare suspicion * * *.

*Id.* (quoting *Marrone v. State*, 359 P.2d 969, 984 (Alaska 1961)). Ashby argues that there was sufficient foundation to introduce the evidence regarding Wright because Wright lived in the same neighborhood where the shooting occurred, he had a prior relationship with both Bryant and the Schwab family, and Ashby, had he testified, would have placed Wright at the scene of the shooting.

---

1. Gaston's testimony, out of the presence of the jury, was as follows:

 Q: Now, what made you approach Mr. Wright? Why did you go up to him?
 A: Because people were talking about what was going on with Teddy [Ashby].
 Q: And what was the information you had? Why did you go up to him?
 A: Because Teddy was going to go to jail for something that Neilyn had done.

 Q: And when you went up to Neilyn, what did you say to him?
 A: I said, "Why are you letting Teddy go to jail for what you did?"
 Q: And what did he say?
 A: He said, "So, the police don't know so I'm not going to tell them." Q: What happened after that?
 A: And then we just left, because it was time for us to go back to our cell.

In addition, Ashby argues that there was some hint that the police may have initially suspected Wright was involved in the murder: when they were investigating the shooting, the police had two photo lineups—one that included Ashby and one that included Wright.

 None of this evidence is so compelling that we are persuaded the trial court abused its discretion in excluding the testimony regarding Wright. We have held that a third person's mere presence in the vicinity of the murder scene was insufficient to connect the person to the crime. *See State v. Fenney*, 448 N.W.2d 54, 62 (Minn.1989). Here, there was not any evidence actually placing Wright at the scene, except the offer of proof that Ashby would have so testified. In addition, when asked whether Neilyn Wright was the third person standing outside by the tree when Bryant was shot, Deja Schwab testified that she was certain it was not Wright. With respect to Wright's relationship with the Schwabs, since presence in the vicinity of the murder is not sufficient to connect a third person to the crime, *see Fenney*, 448 N.W.2d at 62, allegations of a prior relationship with friends of the victim is similarly insufficient to connect Wright to the crime.

 Moreover, Gaston's testimony was properly excluded because it was inadmissible hearsay, not subject to an exception. "*Hawkins* * * * does not abolish the rule against hearsay." *Glaze*, 452 N.W.2d at 661. Ashby argues that Wright's statement should have come in as a declaration against interest because the statement could have subjected Wright to both criminal sanctions and retaliation from gang members. When a declarant is unavailable, an out-of-court statement by that declarant may be admissible if it is against the declarant's interest. Minn. R. Evid. 804(b)(3). There is no dispute that Wright was unavailable; he died before Ashby's trial. Thus, the question becomes whether the statement was against Wright's interest. Ashby argues that the statement was against Wright's interest because it would subject him to both criminal liability, as well as possible gang retaliation in jail. Rule 804(b)(3) requires more than *possible*

criminal sanctions from a statement; the statement must have "so far tended to subject the declarant to * * * criminal liability * * * that a reasonable person * * * would not have made the statement unless believing it to be true." Minn. R. Evid. 804(b)(3). The problem with Wright's statement in light of this requirement is that it was so vague: there was no explicit confession and no actual acceptance of responsibility. Moreover, it is not clear from the statement itself *what* Wright was taking responsibility for—there was no mention of the murder at all.

As for the statement being contrary to Wright's safety interests, in that he may have faced retaliation from opposing gang members for having killed Bryant, no evidence on this issue was presented at trial, nor was the argument raised before the trial court, and again, it is not clear that Bryant's murder was what Wright was taking responsibility for.

 The second piece of evidence Ashby argues he should have been able to introduce was evidence that Wright had prior convictions for illegal possession of weapons. This, Ashby asserts, demonstrates that Wright had knowledge of and access to weapons. However, as stated above, Ashby failed to lay a sufficient foundation as required by *Hawkins* to connect Wright to the crime. In addition, it is not clear that Wright's weapons convictions were even helpful to Ashby's case. The convictions do not demonstrate Wright's familiarity with the type of weapon used in this murder because they were for guns other than the type used to kill Bryant. Thus, the evidence was properly excluded.

 The third piece of evidence Ashby claims he should have been able to introduce was a statement by Michelle Schwab that she had heard that the Crips were out to kill Bryant. Ashby claims this evidence was "highly relevant" and should have been admitted. This statement is hearsay. Unless it falls into an exception, hearsay is not admissible. Minn. R. Evid. 802. Ashby argues that the statement falls into the state-of-mind exception to the hearsay rule. This exception allows admission of a "statement of the declarant's then existing state of mind * * *,

but not including a statement of memory or belief to prove the fact remembered or believed * * *." Minn. R. Evid. 803(3). It is not clear how Ashby claims Schwab's statement fits into this exception. First, *Michelle Schwab's* state of mind is not relevant to whether Ashby, or another Crip, had a motive to kill Bryant. It is not alleged that Michelle Schwab, the declarant, was the killer, or a member of the Crip gang. Second, the statement falls squarely within the limitation: a statement of belief offered to prove the fact believed. It was therefore properly excluded from evidence.

█ The second issue raised by Ashby is that the evidence presented at trial was insufficient as a matter of law to sustain a guilty verdict, and that his conviction should therefore be reversed. On a challenge to the sufficiency of the evidence, the court's only inquiry is whether, on facts in the record and legitimate inferences drawn therefrom, a jury could reasonably conclude that the defendant was guilty. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988). The court must view the evidence in the light most favorable to the prosecution and assume the jury believed the prosecution's witnesses and disbelieved any contrary evidence. *Id.*

█ While a conviction based only on circumstantial evidence warrants stricter scrutiny, such "evidence is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *Id.* at 484. "The conviction may stand only where the circumstances form 'a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.'" *Id.* (quoting *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn. 1980)). This standard still requires that the court recognize that the jury is in the best position to evaluate the credibility of witnesses and the weight given to the testimony of those witnesses. *Id.*

█ Taking the evidence in the light most favorable to the jury's verdict, the evidence against Ashby was as follows: Bryant offended Ashby by insulting his gang affiliation in front of Ashby's girlfriend; the two then got into a fist fight in which Ashby was beaten, again in front of the girlfriend; Ashby left the apartment building, saying he would return; Bryant was seen talking to Ashby in the entryway of the apartment building immediately before he was shot; Ashby was the only person, besides Bryant, present in the entryway; the autopsy and physical evidence showed that the shooting occurred at close range. From this, the jury could have excluded any other inference beyond a reasonable doubt other than that Ashby was indeed the person who shot Bryant. We therefore conclude that the evidence was sufficient to support the conviction.

Ashby's third claim is that he was denied the right to a fair trial because the prosecutor committed misconduct during his closing argument. Specifically, Ashby alleges that the prosecutor improperly preyed upon the jurors' fear of gang violence; that he shifted the burden of proof; and that he improperly denigrated the defense theory.

█ A prosecutor may not seek a conviction at any price. *State v. Salitros*, 499 N.W.2d 815, 817 (Minn.1993). A "prosecutor must avoid inflaming the jury's passions and prejudices against the defendant," *State v. Porter*, 526 N.W.2d 359, 363 (Minn.1995), or otherwise seek to distract the jury from its proper role of deciding whether the state has met its burden, *see Salitros*, 499 N.W.2d at 819. This court "will pay special attention to statements that may inflame or prejudice the jury where credibility is a central issue." *Porter*, 526 N.W.2d at 363. At the same time, however, the court must give proper deference to the role of the trial court. Whether a new trial should be granted because of misconduct of the prosecuting attorney is governed by no fixed rules but rests within the discretion of the trial judge, who is in the best position to appraise its effect. *Wahlberg*, 296 N.W.2d at 420. *

█ Not every instance of misconduct warrants a new trial, however. "The defendant is not entitled to a new trial where it

can be said with certainty that the misconduct was harmless beyond a reasonable doubt." *Porter,* 526 N.W.2d at 365 (citing *State v. Boitnott,* 443 N.W.2d 527, 534 (Minn. 1989)). When applying the harmless error test, the court must "look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict. If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt." *State v. Jones,* 556 N.W.2d 903, 910 (Minn. 1996) (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993)).

■ After reviewing the entire closing argument, we are not persuaded that the prosecutor committed any misconduct by improperly preying upon the jurors' fear of gang violence. The prosecutor did tell the jury to "keep its eyes on the prize" of truth, but this was in the context of describing the jury's role in evaluating the credibility of witnesses, and therefore did not stray from the jury's duty. The prosecutor's comments about gangs and fears of retaliation were not directed specifically at the jury, but rather were describing the circumstances of the case. While it is true that some jury members expressed concern over their personal safety at the end of the trial, it is not necessarily the case that this was a result of the prosecutor's comments. The entire trial was marked by references to gang membership and activity because that was the world in which the parties lived, and that was the context in which the murder occurred.

■ We are similarly not persuaded that the prosecutor impermissibly shifted the burden of proof by commenting on Ashby's failure to subject himself to gunpowder residue and DNA tests to prove his innocence. Ashby correctly points out that there was no evidence introduced at trial that showed that Ashby knew or had reason to know of the tests such that one could infer anything from his failure to subject himself to the tests. Because the prosecutor based his comments on facts not in the record, it was error. However, in light of the strength of the evidence against Ashby, we conclude beyond a reasonable doubt that this error would not

have impacted the jury's decision, and was therefore harmless.

■ Nor do we believe that the prosecutor improperly denigrated the defense theory. While the prosecutor is free to argue that there is no merit to a particular defense or argument, and prosecutors are free to anticipate arguments defense counsel will make, the prosecutor may not generally belittle a particular defense in the abstract. *Salitros,* 499 N.W.2d at 818 (holding that comment by prosecutor that defense attorneys always try to draw attention away from their clients was improper); *State v. Bettin,* 309 Minn. 578, 579, 244 N.W.2d 652, 654 (1976) (holding that prosecutor improperly commented that insanity defense is "push-button" defense that defendants raise when they "cannot think of anything" else); *State v. Kirvelay,* 311 Minn. 201, 202, 248 N.W.2d 310, 311 (1976) (holding that it was improper for prosecutor to state it is a "soddy" defense whenever a defendant claims someone else committed the crime). The prosecutor's comments here cannot be characterized as denigrating a defense theme in general. His comments were that allegations are easy to make, but the jury must look at the evidence. The comments are more properly characterized as addressing the defense's main theory—that someone else committed the crime. The comments were therefore not improper.

■ Finally, we reject Ashby's argument that the prosecutor mischaracterized the evidence by saying that Deja had seen the person who shot Bryant and that "he" was Ashby. A prosecutor may draw reasonable inferences from the evidence produced at trial. *Porter,* 526 N.W.2d at 363. The prosecutor's statement here was a reasonable inference that could be drawn from Deja's testimony.

We therefore conclude that the prosecutor did not commit any misconduct which warrants a reversal.

■ Finally, in his supplemental pro se brief, Ashby claims that he was denied his right to be judged by a jury of his peers because there were not any people of color in the prospective juror pool. To establish a

prima facie case for such a claim, a defendant must show, among other things, that the underrepresentation of a distinctive group on the jury was a result of a systematic exclusion of the group in question from the jury selection process. *State v. Williams*, 525 N.W.2d 538, 542 (Minn.1994) (citing *Duren v. Missouri*, 439 U.S. 357, 364–67, 99 S.Ct. 664, 668–70, 58 L.Ed.2d 579 (1979)). There was simply no evidence of systematic exclusion presented at the trial court or on appeal. We therefore must conclude that Ashby was not denied his right to be tried by a jury of his peers.

In sum, we hold that evidence that a third person committed this murder was properly excluded from evidence; that the evidence was sufficient as a matter of law to sustain the verdict; that the prosecutor did not commit reversible misconduct during closing arguments; and that Ashby was not denied the right to be tried by a jury of his peers. We therefore affirm the conviction.

Affirmed.