STATE of Minnesota, Respondent,

v.

Rodney Dwight GILLAM, a/k/a Rodney Dwight Gilliam, Appellant.

No. C0–00–407.

Supreme Court of Minnesota.

July 12, 2001.

John Stuart, State Public Defender, Lawrence Hammerling, Deputy State Public Defender, Cathryn Middlebrook, Assistant State Public Defender, Minneapolis, for Appellant.

Mike Hatch, Attorney General, State of Minnesota, St. Paul, and James C. Backstrom, Dakota County Attorney, Phillip D. Prokopowicz, Assistant County Attorney, Shirley A. Leko, Assistant County Attorney, Hastings, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Before and during his trial, appellant Rodney Gillam, an indigent defendant, repeatedly requested substitute counsel, but the district court refused the request in the absence of an exceptional circumstance affecting the appointed attorney's ability or competence. The court also excluded

Gillam from the courtroom on several occasions because of his conduct, including the majority of his trial. Following guilty verdicts on three first-degree murder charges and two second-degree murder charges,[1] the court sentenced Gillam to life in prison on his first-degree premeditated murder conviction. Gillam appeals to our court directly from his conviction. He asks us to determine whether the court erred when it denied Gillam's request for substitute counsel and whether Gillam's conduct was sufficient to warrant his exclusion from the courtroom. Gillam also asks us to determine whether the evidence was sufficient for a jury to find him guilty and whether the jury's verdicts are legally consistent. We affirm.

Rodney Gillam (hereinafter referred to as Gillam) was convicted of the December 10, 1998 murder of his wife, Ocealess Gillam. Gillam is paralyzed from the waist down as the result of an injury sustained 10 years before the murder. At some point after his injury, he developed a severe vascular disease, and in 1996, both of his legs were amputated. Severe complications followed the amputations, and both legs were repeatedly infected. Ocealess Gillam, a nursing assistant, was normally able to provide proper medical care for Gillam's condition, but in September 1998, when the infections became severe and required additional surgery, Gillam was hospitalized. The events that ultimately led to the murder began with Gillam's hospitalization in September of that year.

When Gillam was hospitalized in September and October 1998, Ocealess Gillam began working part-time as a flight checker at the LSG Sky Chef. While working there, she met Edward Mokgwathi, and the two began dating. They became intimately involved, but Ocealess Gillam did not tell Mokgwathi that she was married. When Gillam returned from the hospital, he learned of the affair. Mokgwathi testified that Gillam then telephoned to tell him that Ocealess Gillam was married. Shortly thereafter, Ocealess Gillam and Mokgwathi began living together at Mokgwathi's Eagan apartment. Gillam was hospitalized again on November 7, 1998, and he was released on December 1, 1998. In early December 1998, after Gillam made many telephone calls to Mokgwathi, Mokgwathi ended his relationship with Ocealess Gillam, and she moved back to the Bloomington apartment she previously had shared with Gillam.

During the evening of December 9, 1998, while alone in their residence, Gillam and Ocealess Gillam began arguing and Gillam told Ocealess Gillam that he wanted to kill her. Ocealess Gillam telephoned Mokgwathi for help. She told Mokgwathi that her husband had a gun, that he had pointed it at her, and he was waiting for her at the bottom of the stairs with the gun in his hands. Mokgwathi told Ocealess Gillam to call the police, which she did. Ocealess Gillam also telephoned her mother and told her the same story.

A Bloomington police officer responded to the call, but Ocealess Gillam did not tell the officer that Gillam had a gun. She only told the officer that she wanted to leave her husband, and she needed help getting out of the house. The officer escorted Ocealess Gillam outside with some of her personal belongings, and Mokgwathi picked her up in his car. The two then

---

1. Gillam was charged by indictment with Minn.Stat. §§ 609.185(1) (premeditated first-degree murder); 609.185(3) (first-degree murder while committing a drive-by shooting); 609.185(6) (first-degree murder while committing domestic abuse); 609.19, subd. 1(1) (second-degree intentional murder); and 609.19, subd. 1(2) (second-degree drive-by shooting murder).

went to Mokgwathi's apartment where she stayed the night.

The next day, Ocealess Gillam made arrangements for a tow-truck to meet her at the Bloomington residence. She then paged Mokgwathi for a ride to the residence in order to meet the tow-truck. He agreed and returned to his apartment to meet her, and he also brought her lunch as she requested. Mokgwathi, who said he had a headache, gave Ocealess Gillam the keys to his car and then went inside to take a nap.

A tow-truck did go to the Gillams' residence at noon that day. The tow-truck driver testified that when he arrived at the Gillams' residence, no one was there to meet him. The only car he saw there was the Pontiac Bonneville that belonged to Ocealess Gillam. The driver did not see Gillam's handicap-equipped Lincoln Town Car, but the driver did see a wheelchair sitting in the parking area. The driver waited for a while and then knocked on the front door. Finding the door partially opened, he knocked again and yelled to ascertain if anyone was inside. No one answered, but before leaving he asked his dispatcher to telephone the Gillams to see if anyone would answer. No one answered the dispatcher's telephone call.

At approximately 8:30 that evening, Mokgwathi's roommate returned from a friend's house. Noticing that the garage door to the apartment was open, he went into the garage and found Ocealess Gillam lying face down on the floor of the garage. He ran inside to tell Mokgwathi. Mokgwathi then ran to the garage, yelled for help, and a neighbor called 911 for assistance.

The Eagan police department responded to the call. The responding officers testified that they found Ocealess Gillam's body lying face down near the back of the garage. She was fully clothed, and she was clutching $40 in her hands and also had $3,000 cash in a sock in her pocket. The door of Mokgwathi's car was open, and inside the car were some belongings Ocealess Gillam had taken from her Bloomington residence the night before. Also inside the car was a bag of uneaten fast food, and on the roof of the car was an almost full container of soda from the same fast-food restaurant. The police also found a .380 caliber shell casing just outside the garage stall.

The police interviewed several residents of the apartment complex who stated that they did not witness the homicide, but who did hear two "bangs" coming from the garage area earlier that day at about 12:30–12:40 p.m. The police also interviewed Mokgwathi. He told the officers that Gillam was angry because Ocealess Gillam had left him and that Gillam had recently made death threats against her. Based on this information, the officers contacted the Bloomington police to request assistance in the investigation by locating Gillam at his residence, arresting him, and securing his residence and vehicle pending the execution of a search warrant.

Officers from the Bloomington police department contacted Gillam at his residence that evening where they found him lying in bed. The officers questioned Gillam about how and where he had spent his day, and the officers asked Gillam if he would go to the Eagan police station for further questioning. Gillam agreed, and he was transported there by ambulance. While at the police station, Gillam's hands were tested for gunshot residue, and his residence and vehicle were searched pursuant to a valid search warrant. Gillam returned to his residence the next day.

The police found particles indicative of gunshot residue on Gillam's right hand, on the right sleeve of his leather jacket, on

the interior driver's side door, and on the interior passenger side door of his car. They also found a .380 caliber cartridge in Gillam's car. An analysis made by the Bureau of Criminal Apprehension (BCA) indicated that the shell casing found outside Mokgwathi's garage and the cartridge found in Gillam's car had similar markings, which indicated that they were probably loaded or unloaded from the same firearm magazine. The BCA's analysis also indicated that the unspent cartridge found in Gillam's car and the shell casing found outside of Mokgwathi's garage were consistent with Eldorado Starfire .380 caliber ammunition, and that the markings on the spent casing were typical of markings on shell casings fired from a Berso .380 caliber handgun. In addition, the bullet found in Ocealess Gillam's body had similar markings indicating that it was probably fired from the same type of handgun.

An autopsy conducted by an anatomic clinical and forensic pathologist, whose job it is to determine the cause and manner of death in cases that occur in Dakota County, revealed that Ocealess Gillam died from a single gunshot wound. The pathologist testified that Ocealess Gillam was shot while she was standing, and that the path of the bullet indicated that someone seated could have fired the gun because the bullet entered Ocealess Gillam's body at her midsection just under her left armpit area. The bullet then traveled upward through the chest cavity, left lung, the arch of the aorta, right lung, chest wall, and stopped just under the skin of her right chest cavity. The pathologist estimated the time of death to be around noon or early afternoon.

The police never found the murder weapon, but they later learned that on November 27, 1998, Callye Scott, a friend of Gillam's, purchased a Berso .380 caliber automatic handgun and a box of Eldorado Starfire .380 caliber ammunition at a local pawnshop. Scott testified that she purchased the gun for Gillam while he was in the hospital and then later delivered it to him. But Scott's boyfriend, Jerry Curry, who is also a friend of Gillam's, testified that he gave the gun to Ocealess Gillam. Curry testified that Gillam called him on December 11, 1998, to tell him that Ocealess Gillam was dead and that she had taken the gun with her when she left for Mokgwathi's apartment on December 9, 1998. Curry then called Scott and told her to report the gun stolen.

As part of their investigation, the police uncovered numerous incidents of alleged domestic abuse by Gillam against Ocealess Gillam between 1985 and 1996. Lachaka Cousette, Gillam's daughter who was not biologically related to Ocealess Gillam, testified that she once observed Gillam hit Ocealess Gillam. Cousette also testified that 14 or 15 years earlier, she observed Gillam shoot a gun at the floor in front of where Ocealess Gillam was standing. Anna Brown, a friend of Ocealess Gillam's, testified that she once observed injuries on Ocealess Gillam's forehead. When asked about the injuries, Ocealess Gillam told Brown that Gillam had approached her while she was sleeping, pulled her hair, and beat her face with his fist. On several other occasions, Brown observed bruises on Ocealess Gillam's arms, which Ocealess Gillam attributed to Gillam. Stanley Davis, a friend of Ocealess Gillam's, testified that he once observed Gillam threaten to kill Ocealess Gillam. Davis also observed Gillam pull a gun on Ocealess Gillam and demand money from her. On another occasion, when she walked away from Gillam during an argument, Davis observed Gillam throw urine from his urine bag at her. When questioned about these allegations of domestic abuse, Gillam specifically denied each one.

On April 16, 1999, Gillam was charged by indictment with (1) premeditated murder in the first degree, (2) murder in the first degree while committing a drive-by shooting, (3) murder in the first degree while committing domestic abuse, (4) intentional murder in the second degree, and (5) murder in the second degree while committing a drive-by shooting.

Before the trial began, Gillam did not cooperate with his court-appointed attorney. Gillam refused to sign medical releases that were necessary to collect evidence in support of his pretrial suppression motions. Furthermore, at a pretrial hearing on October 7, 1999, Gillam requested that the court appoint a substitute attorney because he was generally dissatisfied with his court-appointed attorney and he disagreed with the attorney about trial strategies. Gillam testified that he did not "know if [his court-appointed attorney] tried his best. Maybe he was ignorant to the law. I don't know what he was. But my thing is, I just don't want him as an attorney." Gillam also stated that his "game plan is I'm going to do whatever I have to … I refuse to be set up by this man or by this court, to be blackballed, to be eight-balled or whatever you want to call it." Gillam later testified that he refused to cooperate with his court-appointed attorney because of a lack of trust. After considering the testimony, the court requested a substitute attorney from the public defender's office.

At an October 22, 1999 hearing, a representative of the public defender's office stated that he could not appoint a substitute attorney because the law required the district court to first make a specific finding of exceptional circumstances warranting a substitute attorney. *State v. Voorhees*, 596 N.W.2d 241, 255 (Minn.1999).

The court then took statements from Gillam and his court-appointed attorney. Gillam stated that he had been "a little harsh" on his attorney, but he still wanted another attorney appointed. Gillam's attorney stated that he had met recently with Gillam to discuss their differences and whether their relationship had actually broken down. The attorney also stated that he had the impression that Gillam thought it would be possible to proceed to trial without a substitute attorney. In addition, the First District's Chief Public Defender stated that the problems between Gillam and his court-appointed attorney did not affect his court-appointed attorney's ability or competence to represent Gillam.

On October 27, 1999, the district court filed an order finding that Gillam "has not established that exceptional circumstances exist that would deny him the effective assistance of [his] attorney ." The court stated that Gillam could retain a private attorney, represent himself, or accept representation by his court-appointed attorney. The court went on to state that Gillam had chosen to represent himself, and that the court had retained his court-appointed attorney as standby counsel.

On November 8, 1999, which was the day jury selection was scheduled to begin, Gillam requested a continuance to obtain a private attorney. That request was denied, and on November 9, 1999, Gillam requested that his standby attorney be reinstated as his attorney. The court then granted Gillam's request and ordered a continuance until November 12, 1999, to allow Gillam's court-appointed attorney to prepare for trial.

On the first day of resumed jury selection, Gillam's attorney informed the district court that his client was not taking pain medication and the length of time he could sit upright in his wheelchair was

limited. The court accommodated his needs by shortening the workday to six hours and lengthening the breaks so Gillam could return to the jail to lie down. Three days later, the court was informed that Gillam's medical condition had deteriorated further, and the jail physician recommended that the time Gillam spent in his wheelchair be further reduced so as not to exceed 4 hours per day.

The jail physician testified that based on Gillam's medical history and his current medical condition, the seriousness of Gillam's leg lesions and infections would increase if Gillam spent more than 4 hours a day in his wheelchair. The physician also testified that Gillam's physical collapse would be inevitable unless he used a bed. More particularly, the physician stated that use of a bed would allow Gillam to adjust his position in order to relieve the pressure on his lesions as opposed to the use of his wheelchair where the pressure on his infected lesions would be constant. He further testified that if a continuance were granted, it could take 6 months to several years before Gillam's lesions healed enough to allow for a regular trial schedule because Gillam's medical history indicated very long recovery periods. Following the physician's testimony, the court considered whether it could shorten the trial workday further, but ultimately decided that a more reasonable accommodation was to provide a hospital bed for Gillam to alleviate the pressure on his lesions. The court then found that it was medically necessary for Gillam to use the hospital bed to ensure that his lesions healed.

The district court proceeded to accommodate Gillam's medical condition by arranging to have a hospital bed available in the courtroom. The court then ordered Gillam to use the hospital bed either in the courtroom or in an adjacent room where interactive video equipment was connected to the courtroom.[2] Gillam refused to use the bed in either location, and he warned the deputies that if they tried to put him in the bed, he would throw his urine bag at them. The court then ordered that Gillam be returned to the jail and not allowed to return to court until he agreed to use the bed.

Gillam refused to return to the courtroom for several days while jury selection continued. When he did return, he requested that he be allowed to sit in his wheelchair next to his attorney. The district court denied his request, and Gillam responded, "You all can do whatever the fuck you want to do. That's my last offer. Fuck you. Get you a broom, bitch." The court then ordered him to be excluded from the courtroom, and Gillam made obscene gestures at everyone present. Gillam returned to the jail, and jury selection continued in his absence. Gillam was permitted to return to the courtroom for the first day of trial. The trial record does not reflect whether Gillam was seated in his wheelchair or lying in the hospital bed, although at oral arguments, the state's attorney indicated that Gillam was seated in his wheelchair.

At the conclusion of the state's opening argument, Gillam began stating very loudly that he wanted to speak, but the court told him "no." In the midst of Gillam's

2. At oral argument before this court, there was some confusion as to the district court's order. Gillam's attorney stated that the court ordered Gillam to use the hospital bed, which the record supports. The state's attorney, who also prosecuted the case in district court, stated that there was an agreement that Gillam could sit in his chair for 4 hours and then he was required to use the hospital bed. Although this may have been an informal agreement, our review of the district court's order and the trial transcript does not reveal any such agreement.

protests, the court told him that if he kept talking, he would be excluded from the courtroom. Gillam asked again, telling the court that he wanted to represent himself, and he wanted his turn to speak to the jury. He told the court, "I haven't killed anybody." When Gillam refused to stop talking, the court ordered the jury out of the courtroom and called a recess over Gillam's protests. When court was reconvened, the court ordered Gillam excluded from the courtroom for the remainder of the trial. Because Gillam requested to proceed *pro se* before he was excluded, the court directed Gillam's court-appointed attorney to act as standby counsel for the remainder of the trial. The court stated that Gillam "has availed himself of every single opportunity to be disruptive and inappropriate in the courtroom." The court also expressed concern with Gillam's "continuous efforts to stymie this matter proceeding to trial and at some point getting to a verdict. He's way over the line, as far as I'm concerned."

Through the remainder of the trial, the district court placed a speakerphone on the witness stand so that Gillam could listen to the proceedings. Gillam testified via interactive television from the Minnesota Correctional Facility at Oak Park Heights. He testified that when he first returned home from the hospital, Ocealess Gillam told him that she was leaving him for Mokgwathi. He testified that he was concerned about her leaving, but was supportive. He also testified that after Ocealess Gillam left, she would call periodically to check on him. According to his testimony, she was the one who told him to go back to the hospital in November. He also testified that when Ocealess Gillam came to visit him in the hospital on Thanksgiving Day, he noticed that she had a black eye. When he asked her about it, she did not want to talk about it.

Gillam also testified that after he returned home from his November hospital stay, Ocealess Gillam moved back to their home. He stated that Mokgwathi then began making threatening telephone calls. It was at about this same time that Curry brought him Scott's Berso .380 caliber handgun for protection. Gillam testified that Ocealess Gillam put the gun in her blue leather purse and that was the last time he saw the gun. He also testified that on December 9, 1998, he was on heavy medication, and Ocealess Gillam came downstairs crying. Her bags were packed and police had arrived to escort her out of the house. He testified that after she walked out, he never saw her again.

Following Gillam's testimony, the trial proceeded to its conclusion, and the jury returned a guilty verdict on all charges. Gillam was convicted and sentenced to life imprisonment on the first-degree premeditated murder conviction. His direct appeal raises three issues: (1) whether Gillam's Sixth Amendment rights to effective assistance of counsel and to be present at his trial were abrogated, (2) whether guilty verdicts of first-degree intentional murder and first-degree domestic abuse murder are legally inconsistent, and (3) whether the evidence used to convict Gillam was sufficient as a matter of law.

I.

Gillam first argues that the district court abrogated his right to effective assistance of counsel under the Sixth Amendment of the U.S. Constitution. He argues that he is entitled to a new trial because his relationship with his court-appointed attorney was irretrievably broken and the court refused his request to appoint a substitute attorney. Gillam also argues that if we determine that the court erred in excluding him from the courtroom, we do not need to determine whether the error was

harmless because the United States Supreme Court has said that such an error results in automatic reversal. Gillam argues that our cases that engage in a harmless error analysis of the denial of a defendant's right to be present do not apply here because those cases did not involve a trial in absentia. The state argues that Gillam's Sixth Amendment rights were not implicated because the decision to appoint a substitute attorney was within the court's discretion, and the court did not abuse its discretion in denying Gillam's request.

■ The decision to appoint a substitute attorney is within the discretion of the district court. *State v. Fagerstrom,* 286 Minn. 295, 299, 176 N.W.2d 261, 264 (1970). In *Fagerstrom,* we held that:

> [T]he right of an indigent to have counsel does not give him the unbridled right to be represented by counsel of his own choosing. The court is obligated to furnish an indigent with a capable attorney, but he must accept the court's appointee. [A request for a substitution] will be granted only if exceptional circumstances exist and the demand seems reasonable.

*Id.* In *Fagerstrom,* the district court found that the defendant was dissatisfied with his court-appointed attorney, but we concluded that the dissatisfaction did not constitute an exceptional circumstance that required the court to appoint a substitute attorney. *Id.* at 265. We noted that Fagerstrom waited until the day of trial to request a continuance to retain a substitute attorney, and the district court found that he was "completely and adequately represented." *Id.* We therefore deferred to the district court's decision and held that the court acted within its discretion in denying Fagerstrom's request for a substitute attorney. *Id.* at 264–65.

We faced this issue again in *Voorhees,* 596 N.W.2d at 254–55. In *Voorhees,* the defendant requested a substitute attorney because he claimed that he had been "belittled, [and] yelled at, in [his] trauma through this." *Id.* at 255. The district court told Voorhees that the fact that he and his attorney experienced some "personal tension" during the trial preparation phase was not an exceptional circumstance that would entitle him to a substitute attorney. *Id.* The court also stated:

> Sometimes your attorney is going to have to be very blunt and very honest with you and he's going to say things that you're not going to like to hear. But those matters don't go to issues of ability or competence to represent you.

*Id.* We agreed with the district court and upheld the court's decision to deny Voorhees' request. *Id.*

■ Our case law does not specifically define what constitutes an exceptional circumstance. But our cases do indicate that exceptional circumstances are those that affect a court-appointed attorney's ability or competence to represent the client. *Voorhees,* 596 N.W.2d at 255. Gillam urges us to adopt a standard used by the Eighth Circuit Court of Appeals. The Eighth Circuit stated that an exceptional circumstance is "a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *United States v. Webster,* 84 F.3d 1056, 1062 (8th Cir.1996). We decline to adopt this standard because it is more stringent than the "ability or competence" standard we articulated and applied in *Fagerstrom* and *Voorhees.*

■ Examining the facts in the instant case in light of the "ability and competence" standard, the record reflects that Gillam requested a substitute attorney because he disagreed with his court-appointed attorney about trial strategies

and because Gillam was generally dissatisfied. Although in certain circumstances an indigent defendant's disagreements or dissatisfaction with his court-appointed attorney could affect the court-appointed attorney's ability or competence in representing the defendant, we see no evidence suggesting that this happened here. The district court took testimony regarding Gillam's request, weighed the evidence, considered whether the situation affected the attorney's ability or competence to represent Gillam, and determined that Gillam's dissatisfaction did not constitute an exceptional circumstance warranting a substitute attorney. The court noted that Gillam's attorney had been representing him competently and adequately up until then, and the court could find no reason that would indicate the quality of representation would lessen.

The district court's decision to deny Gillam's request for a substitute attorney is consistent with our holdings in *Fagerstrom* and *Voorhees* affirming decisions to deny a request for a substitute attorney in the absence of exceptional circumstances. Because the court properly used the ability and competence standard and the record supports its decision, we conclude that the court correctly found that Gillam's court-appointed attorney was competent and able to represent Gillam even though Gillam was dissatisfied with his representation. We hold that Gillam's Sixth Amendment right to effective assistance of counsel was not violated and therefore the court did not abuse its discretion when it declined to replace Gillam's court-appointed attorney with a substitute attorney.[3]

## II.

■ Gillam next argues that the district court's decision to remove him from the courtroom first during jury selection, then during opening arguments and the trial, violated his constitutional right to be present during critical stages of his trial. The state argues that Gillam "voluntarily * * * absented himself from the courtroom" by engaging "in a pattern of conduct designed to delay and interrupt the trial process." The district court found that Gillam did not absent himself voluntarily, but that his delays and disruptions were severe enough to warrant his exclusion from the courtroom. We review a court's decision to conduct a trial in absentia under an abuse of discretion standard and will not disturb the court's factual findings unless they are clearly erroneous. *State v. Cassidy*, 567 N.W.2d 707, 709–10 (Minn.1997).

The right to be present at all stages of one's trial is guaranteed by the Sixth Amendment's Confrontation Clause. In addition, Minn.R.Crim.P. 26.03, subd. 1(1),

---

**3.** Also intertwined in Gillam's right-to-a-substitute-attorney argument is the argument that the "trial court erred by putting appellant in this position." The Eighth Circuit Court of Appeals has held that when a defendant is offered the choice between proceeding to trial with an unprepared attorney, or no attorney at all, his constitutional right to be represented by an attorney is violated. *Gilbert v. Lockhart*, 930 F.2d 1356, 1360 (8th Cir.1991). It is unclear whether Gillam argues that his attorney was unprepared or whether he was forced to go to trial with no attorney at all. In either case, Gillam's argument fails. Although at one point Gillam did decide to proceed *pro se*, the district court appointed his court-appointed attorney as his standby attorney, which is required by law. Gillam's *pro se* appearance lasted one day. After the first day of jury selection, Gillam requested representation, and the court reinstated his court-appointed attorney. The court also granted a continuance so that Gillam's court-appointed attorney could prepare for trial. However, shortly thereafter, Gillam again fired his court-appointed attorney who was again directed to proceed as Gillam's standby attorney. Thus, the record does not reflect that Gillam's attorney was unprepared or that Gillam was forced to proceed *pro se*.

requires a defendant's presence "at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules." Under Rule 26.03, subd. 1(2), a defendant's continued presence is not required if:

The further progress of a trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to waive the right to be present whenever (1) a defendant voluntarily and without justification absents himself after trial has commenced; or (2) a defendant after warning engages in conduct which is such as to justify being excluded from the courtroom because it tends to interrupt the orderly procedure of the court and the due course of the trial * * *.

*Id.* The rule indicates that a defendant can waive his right to be present either voluntarily or by his actions.

Gillam argues that his decision to remain in jail rather than use the hospital bed does not constitute a "true waiver of his right to be present." Gillam does not articulate whether his argument is based on an involuntary waiver or that his actions did not justify his exclusion. However, the district court specifically found that Gillam did not voluntarily waive his right to be present in the courtroom. We conclude Gillam's exclusion was based solely on his conduct. As a result, our analysis focuses on waiver by action, Minn. R.Crim.P. 26.03, subd. 1(2)2.

Gillam was excluded from the courtroom on three different occasions. The first exclusion occurred during jury selection after he threatened to throw his urine bag at the deputies who were guarding him. Gillam later told the deputies that if he were forced to use the hospital bed, he would throw his urine bag, spit, or do whatever was necessary to avoid getting

into the bed. Earlier that day, the district court had told Gillam several times that he could remain in the courtroom during jury selection only if he used the hospital bed. He also was repeatedly given the option of using the bed in an adjacent room with interactive video capabilities. Gillam indicated that his refusal to use the bed was based on his fear that the jury would perceive him as a "freak." Because Gillam would not follow the court's order to use the hospital bed, he was excluded from the courtroom until he agreed to comply with the court's order. Gillam was later allowed to return, but because he immediately requested his wheelchair and then swore at the judge and made obscene gestures to everyone present, he was excluded for the second time.

Gillam was subsequently allowed to return for the trial, but after the state's opening statement, he once again stated that he wanted to fire his attorney and address the jury himself. The court found that his behavior was "disruptive and inappropriate" and he was excluded for a third time. The court appointed his standby attorney to represent Gillam in his absence and placed a speakerphone at the witness stand so Gillam could listen to the proceedings and testify. Gillam listened via speakerphone when the verdict was read. In addition, he was not physically present during sentencing.

The district court's three decisions to exclude Gillam based on his behavior are consistent with our case law affirming a district court's decision to exclude a defendant based on conduct. In *State v. Kluck,* we affirmed the district court's decision to exclude a defendant who was shackled and then later excluded from a preliminary hearing because of his loud and obstreperous conduct. *State v. Kluck,* 299 Minn. 161, 217 N.W.2d 202, 207 (1974). During the hearing, Kluck attempted to halt the

proceedings and also attempted to fire his attorney. *Id.* The court removed Kluck without an explicit prior warning. *Id.* On appeal, we held that Kluck's exclusion was proper after analyzing the exclusion in light of the U.S. Supreme Court's holding in *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Kluck*, 299 Minn. at 166–67, 217 N.W.2d at 206–07.

In *Kluck*, we relied on the Supreme Court's analysis in *Allen*, which is the same case Gillam cites to support his position that his exclusion was improper. In *Allen*, the defendant was removed from the courtroom for his disruptive behavior and was not allowed to return until he promised to conduct himself appropriately. 397 U.S. at 340, 90 S.Ct. 1057. During Allen's absence, the trial continued to conclusion. *Id.* at 341, 90 S.Ct. 1057. The Supreme Court held that Allen lost his right to be present at trial by insisting on conducting himself in a manner that prohibited his trial from continuing while he was in the courtroom. *Id.* at 346, 90 S.Ct. 1057. Both *Kluck* and *Allen* support the district court's decision in the instant case to exclude Gillam based on his conduct.

■ Gillam cites *Allen* in support of his position that his exclusion violated his constitutional rights, and he argues that the Supreme Court focused on the steps the lower court took to continually inform Allen after his exclusion that he could return to the courtroom if his conduct improved. Gillam suggests that in this case the district court violated his constitutional rights because he was not invited back into the courtroom. However, in *Allen*, the Supreme Court held that a defendant could reclaim his right to be present only when he is willing to behave with the appropriate decorum and respect. *Allen*, 397 U.S. at 345–46, 90 S.Ct. 1057. *Allen* does not appear to stand for the proposition that courts are to continually question an ob-

streperous defendant to determine whether that defendant is ready to behave. Instead, *Allen* indicates that the defendant has the burden to inform the court when he is ready to physically return and conform his conduct to the requirements of the court.

In the instant case, Gillam has presented some evidence that he requested that he be permitted to return to the courtroom, but our review of the record indicates that there is no evidence indicating that Gillam would have curtailed his disruptive behavior upon his return to the courtroom. Rather, the record indicates that Gillam intended from the beginning to do whatever was necessary to prevent his trial from proceeding. Gillam's unwillingness to take pain medication, multiple dismissals of his court-appointed attorney followed by requests for continuances, repeated requests for a substitute attorney, threats of throwing his urine bag, ongoing verbal abuse of the judge and others present in the courtroom, and his refusal to sit in a hospital bed rather than in his wheelchair were all designed to interrupt and delay the proceedings. The record reflects that while the district court was concerned about moving the process along, it also was concerned about the possibility of having to stop midtrial and having a delay of several months to over one year or more. We therefore hold that the district court did not abuse its discretion in denying Gillam his right to be present during jury selection and during trial because Gillam's conduct warranted his exclusion. Because we hold that the district court did not abuse its discretion, we decline to consider Gillam's argument that the harmless error analysis does not apply.

### III.

■ Gillam also argues that the evidence presented at trial was insufficient to

support the jury's verdicts. When we assess the sufficiency of the evidence to sustain a guilty verdict, our inquiry is limited to whether a jury could reasonably conclude from the facts in the record—and the legitimate inferences drawn therefrom—that the defendant was guilty of the crime charged. *State v. Ashby*, 567 N.W.2d 21, 27 (Minn.1997). Further, we must view the evidence in the light most favorable to the conviction and assume that the jury believed the prosecution's witnesses and disbelieved any contrary evidence. *Id.*

■■■ For the jury to find Gillam guilty of first-degree premeditated murder, the state was required to prove that Gillam "cause[d] the death of a human being with premeditation and * * * intent." Minn. Stat. § 609.185(1) (2000). Thus, a conviction is dependent on the state's ability to show causation, premeditation, and intent. Although the evidence presented at trial showing causation, premeditation, and intent was circumstantial, circumstantial evidence "is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *Ashby*, 567 N.W.2d at 27.

■■■ To show causation, the state was required to connect Gillam to Ocealess Gillam's murder. Minn.Stat. § 609.185(1). Several facts presented would have allowed the jury to reasonably conclude Gillam caused Ocealess Gillam's death. Although no one witnessed Gillam leave his townhouse and no one witnessed Gillam kill Ocealess Gillam, the forensic evidence indicated that Ocealess Gillam was killed at about the same time that she was supposed to meet a tow-truck driver at the Bloomington residence. Contrary to Gillam's testimony that he was at home at that time, the testimony of the tow-truck driver indicated that neither Gillam nor his vehicle was at the residence at the time Ocealess Gillam was killed. In addition, particles indicating gunshot residue were found on Gillam's hand and in his car, and a cartridge found in Gillam's car matched a shell casing found at the crime scene. The forensic evidence also supports the inference that the person who shot Ocealess Gillam fired from a short distance away and from approximately the height of her midsection, which is consistent with the state's theory that Gillam fired at Ocealess Gillam while he was seated in his car. This evidence connects Gillam to Ocealess Gillam's murder and supports the jury's causation finding.

■■■ To show premeditation, the state was required to show that Gillam considered, planned or prepared for, or determined to commit the murder prior to its commission. Minn.Stat. § 609.18. Several facts were presented from which the jury could reasonably have inferred premeditation. Gillam told a friend that if his wife left him, he would kill her. Gillam knew that his wife was romantically involved with Mokgwathi. Gillam told Anna Brown that he had a friend get him a gun for protection. Callye Scott and Jerry Curry purchased a gun and ammunition and delivered it to Gillam on November 27, 1999. Although the gun used to murder Ocealess Gillam was never found, forensic evidence indicated that the type of gun and ammunition that killed her were consistent with the type of gun and ammunition Scott and Curry purchased and delivered to Gillam and with the casing found in Gillam's vehicle. This evidence is sufficient to support the jury's finding of premeditation because it shows that Gillam planned, considered, or prepared for the murder.

■■■ To prove intent, the state was required to show that Gillam intended to

kill his wife. Minn.Stat. § 609.185(1). We have held that a "jury may infer that a person intends the natural and probable consequences of his actions * * *." *State v. Cooper,* 561 N.W.2d 175, 179 (Minn. 1997). We have already concluded that the evidence supports the jury's finding that Gillam caused Ocealess Gillam's death. Because intent to kill may be inferred from the nature of the killing—here by gunshot wound—our conclusion that Gillam shot Ocealess Gillam supports the inference that he intended to kill her. The evidence is therefore sufficient to support the jury's finding that Gillam intended to kill Ocealess Gillam.

In a case similar to the instant case, we considered whether the circumstantial evidence presented at trial was sufficient to support a first-degree murder conviction. *Ashby,* 567 N.W.2d at 27. In *Ashby,* we upheld the defendant's first-degree premeditated murder conviction based on evidence that he and the victim were seen arguing, he was alone in an entryway with the victim when the victim was shot, and the victim was shot at close range. *Id.* Here, too, there is sufficient evidence to support the elements of causation, premeditation, and intent of first-degree premeditated murder. We therefore hold that because there was evidence from which the jury could infer causation, premeditation, and intent, the evidence was sufficient to support Gillam's first-degree premeditated murder conviction. Our review of the other guilty verdicts and the additional evidence upon which they rest indicates that the evidence was sufficient to support those verdicts as well. We conclude that the evidence is sufficient to support the jury's verdict. Therefore, we hold that Gillam's request for a new trial is denied.

### IV.

Finally, Gillam requests a new trial on the grounds that the jury's guilty verdicts for both first-degree intentional murder and first-degree domestic abuse murder are legally inconsistent. We have recently addressed this issue in *State v. Crowsbreast,* —— Minn. ——, 629 N.W.2d 433 (2001). We reiterate our holding in *Crowsbreast* that guilty verdicts for first-degree intentional murder and first-degree domestic abuse murder are not legally inconsistent. *Id.* Therefore, we hold that the jury's verdicts were proper and that Gillam is not entitled to a new trial.

Affirmed.

BLATZ, Chief Justice (concurring).

While I concur with the majority's holding that our precedent supports the trial court's ultimate decision to exclude Gillam from the courtroom, I write separately to emphasize that the majority's opinion should not be construed to stand for the proposition that cooperation with a medical accommodation is necessary in order to have physical access to the courtroom. According to the record, the jail physician recommended that Gillam spend a limited time per day in his wheelchair. The district court concluded that providing a hospital bed for Gillam's use in the courtroom was a reasonable accommodation of Gillam's medical needs. A bed would allow Gillam to lie prone and rest so as to not aggravate his wounds, and still allow Gillam to be present for the trial. On review of the record, the offering of the bed was a reasonable accommodation. However, it is the reasonableness of what followed that is at issue.

From the outset, Gillam protested the judge's requirement that he use the bed while in the courtroom. On two of the three occasions that Gillam was excluded from the courtroom, use of the hospital bed was the basis for the exclusion. One

instance in particular, which occurred during jury selection, highlights this connection between Gillam's personal choice not to use the hospital bed and the district court's initial decision to exclude Gillam from the proceedings. When Gillam's counsel confirmed Gillam's refusal to use the hospital bed, the court, having already stated that "[i]f he's going to be in the courtroom, he's going to be in the bed," indicated that Gillam would not be allowed to remain in the courtroom. Gillam then clearly and quite eloquently articulated his concerns regarding his use of the bed in open court:

> I'm willing to comply with the courts as far as doing the right thing as far as this trial, but as far as the bed issue goes, I just feel like I will be put on display. I feel like this is—you're turning your courtroom into a freak show. I almost feel like people in the side show people when people are paraded in to see that they are different than everybody else.
>
> I just kind of want the same opportunity as anybody else to sit at counsel table, to be able to reach over, maybe whisper to my attorney if some things was not right or—and I just think that that's—that's very unfair that I have to lay in that bed. And I just think that— to be truthful with you, Your Honor, it's kind of—I'm not—not comfortable with doing that. * * *
>
> So I'm asking you, I'm begging you all at this point to let me be the person I am, set at the counsel table with my lawyer, and go through this trial without building a side show and without being here to amuse you all for you all to laugh or to amuse other peoples who are coming here to look at me. I'm not going to be a part of it. If that means that you all want to just—if you think that you're going to strip me of the last thing I got, and that is dignity, believe it or not, if you think possibly you're going

to strip me of doing that, no. So if you all got to go ahead without me, that's fine. But I—I want to strongly urge Your Honor, tell you all that that is wrong. That is definitely wrong.

> I'm not asking for nothing special here. I'm just asking for the right to sit at the counsel table like anybody else would, whoever did this. * * * I just want the right to kind of do what everybody else would do in that situation. And I don't want to be looked at as a freak by lying in that bed and having peoples parade in and out of your courtroom and having you to have your courtroom as a side show and I'm on display here. I don't think that's right.

> So if we can't overcome that, then I'm willing to go back to the cell and I'm willing not to come back to this trial and not—I'm hoping that's not the case. I'm hoping I can look at my accusers * * *, and I'm hoping I can challenge whatever they say against me. If that can't be done, I go back to the cell and you all can do this up however you all want to do it.

In responding that "unless you've had a change of heart about using the bed, you are excused," the district court clearly elevated the jail physician's medical recommendation and the concern for moving the process along in an efficient manner above Gillam's right to be present. It was at this point that Gillam became belligerent, swore, and made obscene gestures to all present in the courtroom. While this inappropriate behavior warrants removal, the court had *already* made the decision to exclude Gillam from the courtroom for that day because he refused to use the hospital bed. This is not a cause and effect relationship we can condone.

The accommodation of providing a hospital bed was reasonable. It was unrea-

sonable for the judge to link Gillam's right to be present with the use of the bed. The court could simply have provided a bed in the courtroom. If and when Gillam needed to use it, the bed would be available. If Gillam continued in his refusal to use the bed, the court could have put Gillam on notice that any additional medical attention resulting from his refusal to use the accommodation would not stop the trial. In other words, Gillam was free to sit in his wheelchair at counsel table or to use the bed during trial, but the trial would not be interrupted or delayed as a result of his unwillingness to follow medical advice.

As it was, Gillam did not waiver in his unwillingness to use the bed and therefore was removed from the courtroom on two occasions during jury selection. The irony of forcing someone out of the courtroom because of a concern that he will not be able to physically manage a lengthy trial and remain present is only made more absurd by the court's later allowance of Gillam's participation in the trial by interactive television while he *sat* in the wheelchair.

In summary, providing a reasonable accommodation is different than mandating its use in order to gain access to the courtroom. While I am troubled by what occurred, I join the majority opinion because it was Gillam's disruptive behavior unrelated to the bed that eventually excluded him from the courtroom for the remainder of his trial. Gillam was allowed to return to the courtroom in his wheelchair for opening arguments. His disruption of the proceedings at that point, and not his refusal to use the bed, ultimately barred his presence at his trial. Had use of the bed been his absolute keys to the courtroom, a different result would be required.

PAGE, J. (concurring).

I join in the concurrence of Chief Justice Blatz.